480 F.Supp. 1324 (1979)
Bobby J. SMITH a minor, by his mother and next friend, Lucille Smith; Tony Billingsley, a minor, by his mother and next friend, Cora Billingsley; Matthew Neeley and Katherine Neeley, minors, by their mother and next friend, Florence Neeley, Plaintiffs,
v.
DALLAS COUNTY BOARD OF EDUCATION; Martin R., etc.; John J. Grimes, Jr., Joe K. Rives, Martin Chance, and James Priestly, etc.; Earnest, Frank, etc. and Clarence James, etc., Defendants.
Civ. A. No. 79-0260-H.
United States District Court, S. D. Alabama, N. D.
December 10, 1979.
*1325 *1326 Booker T. Forte, Jr., Legal Services Corp. of Ala., Selma, Ala., Abigail Turner, Legal Services Corp. of Ala., Mobile, Ala., for plaintiffs.
Joe T. Pilcher, Jr., Selma, Ala., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
HAND, District Judge.
This action came on to be heard on the complaint filed by plaintiffs, and on the motions of the defendants (No. 1) to dismiss the action, the complaint, each separate cause of action asserted therein, and each and all class actions asserted therein, for failure to state a claim upon which relief can be granted; (No. 2) to strike or dismiss the complaint for failure to invoke the jurisdiction of the Court by filing a complaint including the names of all the parties, as required by Rule 10(a), F.R.C.P.; (No. 3) to dismiss the action, the complaint, each separate cause of action asserted therein, and each and all class actions asserted therein, for lack of jurisdiction over the subject matter; and (No. 4) for summary judgment, all as more fully shown by the written motions of defendants served on July 3, 1979. The motions to dismiss for failure to state a claim upon which relief can be granted have been treated as motions for summary judgment, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. The Court has carefully considered the complaint and the motions of defendants, together with all affidavits and evidence submitted in connection therewith, arguments of counsel heard orally by the Court, the briefs, the law, and the entire record in this action. The Court has also considered and taken judicial notice of the entire record and proceedings in civil action no. 5945-70-H, now pending before this Court, including all findings and orders of the Court in that action. The Court has also considered the absence of any countervailing affidavits submitted or filed by plaintiffs to deny, dispute, or contradict those facts shown by the affidavits and evidence submitted by the defendants in support of their motions. The Court now makes the following Findings of Fact and Conclusions of Law:

FINDINGS OF FACT
1. The defendants, William R. Martin, John J. Grimes, Jr., Joe K. Rives, Martin Chance, and James Priestley, are members of the Dallas County Board of Education with the defendant William R. Martin being chairman. The defendant Frank Earnest Jr. is Superintendent of Schools of the Dallas County School System. All of the aforesaid individuals have been sued individually and in their aforesaid representative and official capacities.
2. The plaintiffs, Bobby J. Smith, Tony Billingsley, Katherine Neeley, Matthew Neeley, and Clarence Neeley, are students in the Dallas County School System.
3. On October 23, 1969 a three-judge panel in civil action no. 604-E then pending in the United States District Court for the Middle District of Alabama (hereinafter called the Lee Case) ordered the Dallas County Board of Education to file on or before January 15, 1970, a plan whereby, effective with the commencement of the 1970-71 school year, the dual school system based upon race, both as to students and facultyas operated by said school system will be effectively and completely disestablished. The Court further ordered the United States, through the use of educational experts of the Office of Education, *1327 Department of Health, Education and Welfare, to study the operation of the said school system and to confer with and assist the system in formulating the required plan. The Dallas County Board of Education, its superintendent, and members complied with that order.
4. On January 15, 1970 the Dallas County Board of Education filed in the Lee case its proposed plan for the effective and complete disestablishment of a dual school system based upon race, effective with the commencement of the 1970-71 school year. That plan was approved by attorneys for the United States, as modified and supplemented. On February 13, 1970 the three-judge court in the Lee Case found that the plan as filed by the Dallas County Board of Education on January 15, 1970, as modified and supplemented by the Court, when fully implemented effective not later than the commencement of the 1970-71 school year, would completely and effectively disestablish the dual school system based upon race as operated by the Dallas County Board of Education. The Court approved the plan and ordered the Board of Education to implement it.
5. The approved plan for the Dallas County School System contained the following affirmative duties and obligations imposed on the Dallas County Board of Education by court order:
a. To effectively and realistically disestablish a dual school system, based upon race, both as to students and faculty, and to maintain a bi-racial public school system supported by a majority of white as well as black students.
b. To organize schools administratively so as to offer each minority white child as well as majority black child equal educational opportunity through curricula organization most suited to needs.
c. To utilize the school system's existing personnel, talents, and abilities without discrimination to achieve the foregoing objectives, and to maintain public support in compensating professional educators for services rendered.
d. To provide transportation on a nondiscriminatory and non-segregated basis for all eligible children.
e. To implement the plan with an instructional program to assure better learning opportunities for all students, as a continuous activity; to review student evaluation policies and procedures continuously for areas in need of improvement and adjustment to encourage the educational growth and motivation of students; to introduce and/or expand remedial programs in reading and mathematics skills, as appropriate, for all students in need of special help; to supplement regular course offerings and assignments of students; to review and revise, as necessary, grouping procedures to assure they support the spirit as well as letter of the desegregation plan. The full plan, as well as the February 13, 1970 order in the Lee Case, appear of record in this Court in civil action no. 5945-70-H.
6. On March 31, 1970, the three-judge panel in the Lee Case ordered that all proceedings in said civil action no. 604-E against the Dallas County Board of Education, its superintendent and individual members, be transferred to this Court. Pursuant to that order, the Lee Case was transferred to this Court, and was assigned civil action no. 5945-70-H. That civil action is still pending before the Court.
7. On April 4, 1971, the United States filed a motion for supplemental relief in the Lee Case seeking a new desegregation plan with respect to student attendance. On July 27, 1971 the United States and the School Board (where used, the term shall include the Dallas County Board of Education, its members, and its superintendent) entered into a consent order by which the Board agreed to comply with the Court ordered desegregation plan. That consent order afforded the United States the opportunity during the 1971-72 school year to evaluate the progress in desegregation of the Dallas County School System, and required the school board to cooperate with the United States in providing the information necessary for such evaluation. Such evaluation was accomplished by counsel for *1328 the United States, with the cooperation of the board, and included a full review of school and attendance records, an examination of all reports submitted to HEW, and actual physical inspections of the Dallas County Schools during school attendance hours. There were no complaints by the United States following that evaluation, inspection, and examination.
8. On September 21, 1972, the National Education Association (NEA), as intervenor, filed in the Lee Case its motion for further relief and for a permanent injunction. On October 10, 1972 this Court ordered counsel for NEA to contact the parties and arrange a conference to discuss issues in controversy and to present a consent order resolving all possible issues, with the proviso that any unresolved issues would be certified to the Court by the aggrieved. Counsel for the NEA failed to comply with that order, and on March 14, 1975 this Court ordered that the proceedings be dismissed unless the parties show good cause within fifteen (15) days. In response to that order, the United States filed a response requesting that the Court allow a reasonable time for the United States to complete an investigation to determine whether the alleged violations, and any other violations of applicable federal law, existing at that time, representing that the United States had already initiated an investigation to determine whether the school board had complied with the 1970 court order and applicable federal law. This Court granted the request of the United States, allowing forty-five days for the completion of the investigation in order to assure that constitutional violations did not exist or that any such violations which did exist could be properly remedied. And, on April 1, 1975, the Court ordered the parties to confer and to certify to the Court which areas of controversy then existed and which areas of agreement had been reached. In response to that order, the parties filed a response on June 4, 1975 certifying that only four, specified issues then remained unresolved and contested. Such remaining issues involved non-racial criteria to be utilized in personnel actions and other issues involving employment or assignment of personnel. There were no remaining issues with respect to the constitutionality or the appropriateness of the approved desegregation plan; nor were there issues certified relating to modification of the approved plan or to the methods of testing, placement, or instruction of students.
9. On June 5, 1975 this Court ordered a hearing on the certified issue in the Lee Case, and a full evidentiary hearing was conducted by this Court on July 8, 9, and 10, 1975. During the course of that hearing, evidence was introduced and considered by this Court relating to the racial composition of the faculty and student body at the various schools, and other matters relating to the compliance by the board with the approved desegregation plan. On October 22, 1975, the United States and the school board submitted a consent decree to the Court, which was approved and entered by the Court, disposing of all issues then remaining and finally terminating and concluding those proceedings. The consent decree of October 22, 1975, specifically adjudicated, resolved, and terminated all issues then existing relating to the approved desegregation plan and the compliance by the school board with the requirements of law and the orders of this Court.
10. On February 10, 1977 this Court made and entered an order finding that the Dallas County School System was then desegregated and unitary and had been such at least since the consent order of October 22, 1975. In that order, this Court prescribed reporting requirements for the Dallas County School Board and established due process requirements to afford all parties an opportunity to file timely objections. The February 10, 1977 order became final without objections or timely appeal.
11. On July 26, 1977 the United States filed a motion for enforcement and modification of injunction in the Lee Case, alleging that the Dallas County School Board *1329 has failed to comply with the approved desegregation plan and that the desegregation plan had failed to fully desegregate the Dallas County School System and should be modified. By order of November 10, 1977 this Court denied so much of the Government's motion as requested modification of the desegregation plan, finding that the validity of the plan had been re-affirmed by this Court's prior rulings and the order of February 10, 1977. The Court ordered a hearing on the Government's allegations that the school board had not complied with the approved desegregation plan; that hearing was held before this Court on January 26-27 and February 1-2, 1978. Following that hearing, this Court entered in the Lee Case its Findings of Fact, Conclusions of Law, and Judgment of February 23, 1978. In that order, this Court found that there were violations of the desegregation plan in the nature of zone jumping, but that the board's involvement in such violations was in the nature of negligence, in the sense that the board failed to take affirmative steps to preclude such violations, rather than intentional, in the sense that the board openly advocated, encouraged, or aided such zone jumping.
12. In its July 26, 1977 motion, and during the 1978 evidentiary hearing thereon the Government alleged that the Dallas County Board of Education discriminated against certain students because the program, facilities, equipment, and supplies available at each of the schools were unequal. The expert witness for the Government testified that at the elementary level, Southside, J. E. Terry, and Valley Grande Elementary Schools were superior facilities to Five Point, Hunter Mission, Salem, and Martin Station Elementary Schools. In its order of November 10, 1977, this Court expressly found that there was no showing that the decisions made by the Dallas County Board of Education with respect to funding, new construction, school closing, and acceptance of community contributions were based on anything other than sound educational criteria. The Court found no constitutional violations by the school board with respect to the educational program and facilities at any of the elementary schools within the Dallas County School System, including Valley Grande.
13. During the course of the hearings before this Court in the Lee Case on February 2, 1978, this Court ordered the Dallas County Board of Education to verify the residence of every student in the system and to transfer all students not properly enrolled to the school that they should be attending under the approved desegregation plan. In compliance with that order, the Dallas County Board of Education investigated and verified the residences of all students within the system and took action in the middle of the school year to transfer those students who were enrolled out of zone, all as ordered and required by this Court.
14. At the beginning of the 1977-78 school year, the plaintiffs attended Brantley Elementary School. Plaintiffs were, however, living in the Valley Grande School zone and were improperly attending Brantley School. Pursuant to this Court's order of February 2, 1978 the defendants in this case took action to transfer all of the plaintiffs from Brantley Elementary School to Valley Grande School.
15. Valley Grande Elementary School was constructed in 1968-69, and opened as an elementary school in the 1969-70 school year. Valley Grande Elementary School is a non-graded school and has been such since it was opened in 1969. On October 11, 1968 the Dallas County Board of Education approved the adoption of a non-graded curriculum for Valley Grande Elementary School. The non-graded curriculum has been used at Valley Grande continuously since that time. The non-graded curriculum at Valley Grande School was installed as a pilot program to determine its effectiveness and the feasibility of employing that system in other schools within the Dallas County School System.
16. The professional teachers, school administrators, and the defendants in this action *1330 are satisfied with the results of the non-graded curriculum at Valley Grande School. Prior to the institution of this action the defendants had made plans to adopt the non-graded curriculum at all other elementary schools, effective at the commencement of the 1979-80 school year. That has been accomplished and, at this time, all elementary schools within the Dallas County School System employ the non-graded curriculum.
17. At the commencement of the 1978-79 school year, and at the time plaintiffs were transferred from Brantley to Valley Grande, Brantley Elementary School did not have a non-graded curriculum but, instead, had the traditional graded system. However, within the grade structures, students were nevertheless leveled according to their abilities and achievements using the evaluations by professional teachers and school administrators who relied upon the Houghton-Mifflin Placement Test.
18. In the traditional graded system employed at Brantley School, students were still permitted to read at their levels of achievement. The levels were determined by the use of the Houghton-Mifflin Placement Test.
19. When plaintiffs were transferred from Brantley Elementary School to Valley Grande Elementary School, they were among a group of approximately fifty to sixty students transferred to Valley Grande from Brantley, J. E. Terry, and Hazen Harrell Elementary Schools. These new students were both black and white. All transferred students were given both the Houghton-Mifflin Pupil Placement Test and the Math Placement Test, which tests were utilized at Valley Grande Elementary School in connection with the operation of the non-graded curriculum at that school. The transferred students, including plaintiffs, were not treated any differently than other pupils who were attending Valley Grande Elementary School and all were administered the same tests and were placed in appropriate levels by professional educators responsible for such placement. There is no evidence that defendants, nor any other professional staff or persons employed by the Dallas County School System, treated plaintiffs differently from the other students or intentionally discriminated against these transfer students.
20. Plaintiffs have not been placed in grades at Valley Grande Elementary School, as alleged, but instead have been assigned to instructional levels consistent with their demonstrated achievements. Placements were made by professional school personnel employing as one of their professional tools both the Houghton-Mifflin Placement Test and the Math Placement Test.
21. At the beginning of each school year the principal and staff of Valley Grande School attempted to inform students and parents of the non-graded curriculum employed at Valley Grande. At the beginning of the 1977-78 school year notices were sent to all parents of students then enrolled, encouraging them to attend a program held in conjunction with a PTA Meeting to answer questions, to discuss procedures about student placements, and to discuss procedures to be followed if students or parents were not satisfied with placements. Because the plaintiffs were improperly enrolled at Brantley School, they were not notified of these programs and did not attend.
22. Under regular prescribed procedures, the principal, teachers, and professional staff at Valley Grande School attempt to explain the non-graded curriculum and the placement procedures to all students and to those parents who have questions or objections. Ms. Louise Mitchell, System Guidance Director for the Dallas County School System, reviewed the records of the plaintiff, Bobby Smith, and visited his mother, Lucille Smith, following her complaints about student placement at Valley Grande School. Ms. Mitchell explained to Mrs. Smith the difference between the Brantley School Program and the Valley *1331 Grande School Program and explained that at Brantley the child was enrolled in a traditional grade but was assigned class activities on his functional level whereas at Valley Grande School the child was enrolled at his functional level. She also explained that both Brantley School and Valley Grande School used the same basic State-adopted readers from the Houghton-Mifflin series.
Mrs. Smith was also afforded the opportunity to discuss the facts concerning the placement of Bobby Smith with his teacher and principal.
23. Mrs. Marjorie P. Perry, Bobby Smith's teacher at Valley Grande, also had contact with Mrs. Smith after Bobby Smith's transfer from Brantley School. Mrs. Perry attempted to explain the system and placement procedures at Valley Grande to Mrs. Smith.
24. All of the initial testing and placement procedures which were employed by the defendants with respect to each and all of the placements occurred in February, March, and April, of 1978, following the transfer of plaintiffs and other students to Valley Grande Elementary School in the middle of the school year pursuant to the order of this Court. The actions, placements, tests, and procedures, were done more than a year before suit was filed in this case.
25. At the beginning of the 1979-80 school year, both Brantley School and Valley Grande School are employing the same non-graded curriculum and using the same testing methods and procedures.
26. The defendants have adopted administrative policies and procedures for the review and re-evaluation of testing and placement procedures employed at Valley Grande Elementary School and all other elementary and secondary schools within the Dallas County School System. The Dallas County Board of Education has for many years followed those due process procedures in handling complaints from students, parents, and school personnel. These procedures require the aggrieved party to present the problem so that it can be quickly resolved at the lowest possible level. The aggrieved party is encouraged to go first to the teacher or other staff, then to the principal of the affected school, then to the Superintendent of Education, and finally to the Board of Education. Also, under the provisions of section 16-4-8 of the 1975 Code of Alabama, the State Superintendent of Education has the power to review actions and orders of the Board of Education in matters relating to finance and other matters seriously affecting the educational interests and to determine from the facts the just and proper disposition of the matter. This statutory provision permits a further due process method of review in matters seriously affecting the educational interests, such as the validity of a non-graded school system or the testing and placement methods employed in such school system.
27. At the beginning of the 1978-79 school year, around November 1, 1978, Mr. Booker T. Forte, Jr., attorney for the plaintiffs, contacted a defendant, Frank Earnest, Jr., regarding placements of pupils at the Valley Grande Elementary School to see what, if anything, was done to inform parents of these requirements. Mr. Earnest advised Mr. Forte that the principal of Valley Grande, Mr. Clarence James, or his delegated staff person briefed each parent at registration time and, as needed, conducted meetings for parents periodically. Usually, a meeting for parents is held at the beginning of each school year. Mr. Forte then questioned Mr. Earnest concerning the due process procedures of the Dallas County School Board and Mr. Earnest referred Mr. Forte to Joe T. Pilcher, Jr., attorney for the Board of Education.
28. On November 14, 1978 Mr. Forte then wrote Mr. Pilcher and advised Mr. Pilcher that he, Mr. Forte, had been retained by the parents of certain of the plaintiffs to represent them "as a result of their reduction in grade" upon their transfer *1332 from Brantley to Valley Grande. Mr. Forte requested "a review of the policy which requires the above named students being placed in lower grades" and advised Mr. Pilcher of his belief that "the only alternative at this time is litigation of the matter in the Court." Mr. Forte requested an expeditious response stating, "otherwise we will assume a failure to respond means this matter should be resolved in Court."
29. On November 16, 1978 Mr. Pilcher wrote to Mr. Forte, acknowledged the November 14 letter, and advised that the Board of Education would be glad to afford a hearing, provided Mr. Forte first schedule and arrange a hearing with Mr. Frank Earnest, Jr., Superintendent of Education, to see if the matter might be resolved at that level. Mr. Pilcher specifically advised Mr. Forte that if the matter could not be resolved by Mr. Earnest that the Board of Education would grant a hearing before the Board. Mr. Forte was instructed to contact Mr. Earnest directly and arrange a date and time satisfactory to all parties; he was further advised if the matter could not be resolved at that hearing, then Mr. Earnest could arrange a hearing before the entire Board.
30. Mr. Forte thereafter contacted Mr. Earnest and, on December 11, 1978, was afforded a hearing before Mr. Earnest. Present for the hearing were Mr. Forte and his clients, Mrs. Emma Smith, Mrs. Billingsley, Mrs. Florence Neeley, and Mrs. Lucille Pond. Also present for the conference were Mr. Frank Earnest, Jr., Superintendent of Education, Ms. Louise Mitchell, Systems Guidance Director, Mr. Otis Woody, Systems Attendance Director, the defendant, Mr. Clarence James, Principal of Valley Grande Elementary School, and Joe T. Pilcher, Jr., School Board attorney. At this conference, the parents complained about their children being placed in a different grade at Valley Grande from that of Brantley School. Mr. Earnest and his staff explained that the Valley Grande Elementary School is organized by levels, not grades, which levels are based upon progress in mastery of a progression of basic skills; that the principal at Valley Grande, in keeping with policies of the School Board, administered tests relating to the mastery of the skills in the adopted test book series and placed all children in the proper levels in reading and math so they can function; that each child moves up to a higher level as he or she masters the skills of a given level; that a child can move up a level in the middle of a year because of the nongraded instructional program; that there are black children in all levels, depending on achievement, just as there are white children at all levels; that a child normally will stay in the elementary department from five to eight years, depending on the individual progress of the child; that there is no social promotion in a non-graded curriculum but that the concept is simply to place students at the proper level so that they may achieve maximum benefits and not be placed in levels above their abilities; that when students complete these levels they will have completed or mastered the basic skills and will be prepared to successfully cope with the secondary grades when they graduate. Mr. Earnest and his staff agreed to re-test the plaintiffs and other pupils as regarded their proper placement at the Valley Grande School. The results of the re-evaluation were to be forwarded to the parents of the students.
31. Following the conference, plaintiffs and other students then represented by Mr. Forte were re-tested, and teachers who had taught the students prior to their enrollment at Valley Grande were also consulted.
32. On January 9, 1979, Mr. Earnest wrote to Mrs. Emma Smith, Mrs. Cora Billingsley, Mrs. Florence Neeley, and Mrs. Lucille Pond and enclosed data sheets explaining the placement of their children. The re-evaluations and consultations did not result in any placement changes, but they did confirm the prior placements of the plaintiffs.
33. On February 20, 1979 Mr. Forte again wrote Mr. Pilcher and advised that *1333 his clients, Mrs. Pond and others, were dissatisfied with the present status of their children. Mr. Forte requested that the School Board provide certain information concerning the School System at Valley Grande. Mr. Forte did not request any further due process hearings nor did he request a hearing before the Board of Education.
34. On March 6, 1969 Mr. Pilcher wrote Mr. Forte and informed him that most of the requested information had been sent directly to Mr. Forte's clients, in accordance with the understanding and arrangement reached during the December hearing. Mr. Pilcher advised Mr. Forte of the prohibitions and requirements of the Family Education Rights and Privacy Act of 1974 and furnished a copy of the disclosure form which is required prior to the release of any information concerning individual students. Mr. Forte was advised that he could have the parents obtain the information directly from the school, or could obtain the information himself by furnishing the required disclosure forms.
35. On March 13, 1979 Mr. Forte mailed xerox copies of disclosure forms executed by Mrs. Ponds, Mrs. Billingsley, and Mrs. Neeley. Subsequently he was requested by Mr. Pilcher on March 19 to provide original, executed authorizations. In the meantime, the principal at Valley Grande School had made available to Mr. Forte and his clients all of the files which he had for inspection by Mr. Forte or some other attorney in his office. The Board of Education and the principal at Valley Grande School have given Mr. Forte and his clients full access to all student records relating to the plaintiffs in this case.
36. On March 27, 1979 the defendant, Frank Earnest, Jr., as Superintendent of the Dallas County Schools, appointed a Bi-Racial Committee chaired by a black principal to investigate the complaints of plaintiffs. The Bi-Racial Committee concluded: 1) that plaintiffs were placed in the proper level; 2) that each plaintiff was placed in the level where they could advance without becoming frustrated, as would be the case if they could not work at the same rate of speed as some of the other students; 3) that each of the students attended school regularly and had not indicated in any way that they resented the level in which they had been placed; and 4) that the teachers all agreed that plaintiffs could not perform satisfactorily if they would be placed in higher levels. This Bi-Racial Committee was comprised of Mr. George Evans, as Chairman, Mr. Harold Crenshaw, Mr. O. P. Woody, and Mr. Elwood Sims. The complete report of the committee reviewed in detail the non-graded instructional method used at Valley Grande School as well as the Houghton-Mifflin Reading Series levels used in Dallas County Schools. Also, this committee individually reviewed the testing and placement procedures with respect to all of the plaintiffs and other students represented by Mr. Forte, and they concurred in the placement action taken. Committee review indicated that all of the plaintiffs were making satisfactory progress at Valley Grande School in their assigned levels.
37. The Superintendent of Education has afforded plaintiffs and their attorney a full review of the testing and placement procedures by the teachers, principal and staff at Valley Grande. Plaintiffs' attorney has reviewed the procedures used by: 1) the system's guidance director and her staff; 2) a special professional bi-racial committee appointed specifically for that purpose; and 3) the Superintendent of Schools. All of these re-evaluations and reviews confirmed the accuracy of the student placement of plaintiffs, and there is no evidence before the Court that those placements were improper, unlawful, or unconstitutional in any respect.
38. Neither plaintiffs nor their attorney have ever requested the defendant, Dallas County Board of Education, and its individual members, to review the testing, placement, and notification procedures of the staff and principal at Valley Grande School. *1334 Nor has a request been made to review the evaluation of the Superintendent of Schools and his professional staff who re-evaluated both the plaintiffs' placements and the procedures used in placing the plaintiffs. Neither plaintiffs nor their counsel have sought a review of such policies and procedures before the State Superintendent of Education. The Valley Grande School has followed and employed the non-graded curriculum since 1969 and neither the non-graded curriculum nor the placement, testing, and notification procedures employed have ever been challenged by any of the plaintiffs or plaintiff intervenors in the Lee Case. There have been many evidentiary hearings and other proceedings in the Lee Case since the desegregation plan was adopted and ordered implemented in it, and at no time have the testing, placement, and notification procedures followed at Valley Grande School in connection with its non-graded curriculum been questioned or challenged by the United States, NEA, or any of the other parties in the Lee Case.
39. The defendant, James Priestley, has been a member of the Board of Education since November 10, 1978.
40. The defendant, William R. Martin, has been a member of the Board of Education since November 25, 1968 and has served as chairman since 1974.
41. The defendant, John J. Grimes, Jr., has been a member of the Board of Education since November 2, 1967 and has served as vice chairman since 1971.
42. The defendant, Martin Chance, has been a member of the Board of Education since November 5, 1974.
43. The defendant, Joe K. Rives, has been a member of the Board of Education since July 2, 1968.
44. The defendants, Rives and Grimes, are the only defendants who were serving as members of the Board of Education on October 11, 1968 when the Board of Education originally approved and adopted the non-graded curriculum at Valley Grande School. The other defendants have become members of the Board of Education after that action was taken by the Board.
45. All of the defendant members of the Board of Education believe that the non-graded curriculum at Valley Grande School is a good system, and, in fact, have taken steps to adopt the non-graded system at all of the elementary schools during the school year 1979-80. None of the defendant members of the Board of Education believe that any of the tests which are administered, including the Houghton-Mifflin Test, are unconstitutional or that they violate the civil rights or constitutional rights of plaintiffs or other students. Those tests and those procedures were employed during the times when plaintiffs and plaintiff-intervenors in the Lee Case, including the United States and NEA, were challenging the desegregation plan and its implementation in the Dallas County School System.
46. All of the actions which have been taken by the defendants relating to the placement of students at Valley Grande School, the maintenance of a non-graded school system there, and the administration of such system, have been taken by the defendants in the good-faith belief and opinion that such actions and procedures were lawful, constitutional, and in the best interests of the school children thereby affected.
47. There is no evidence that any of the defendants have acted with the malicious intention to cause a deprivation of the civil rights or constitutional rights, or other injuries, to the plaintiffs or any other students within the Dallas County School System.
48. It is the best judgment and opinion of the defendants that the non-graded school system, and the method of leveling used at Valley Grande Elementary School, is a valid, accepted, and valuable teaching method. Such a system and method have been proven to be valid within the Dallas County School System and have been approved by the State Education Department. There has never been a suggestion or claim *1335 brought to the attention of any of the defendants by any responsible school official that such system and methods were wrong, injurious, unlawful, or unconstitutional. Neither has there been such a suggestion or claim brought to the attention of the defendants by any of the plaintiffs or plaintiff-intervenors in the Lee Case during the course of that litigation.
49. There is no evidence that any of the defendants are in violation of the approved desegregation plan or other orders of this Court.
50. There is no evidence that any of the defendants haveat least since October 22, 1975on the grounds of race, color, or national origin, excluded plaintiffs or other students in the Dallas County School System from participation in any program or activity receiving federal financial assistance. Nor is there evidence that the defendants have denied plaintiffs or other students the benefits of any such programs or activities receiving federal financial assistance on a discriminatory basis.
51. There is presently before this Court, in civil action no. 5945-70-H, a class action involving the desegregation of the Dallas County School System. The Lee Case raises the issues sought to be adjudicated in this action: each and all of the alleged violations of 42 U.S.C. § 2000d, 20 U.S.C. § 1703, 42 U.S.C. § 1981, and 42 U.S.C. § 1983, as well as each and all class actions asserted by the plaintiffs herein relating to the desegregation plan of the Dallas County School System, the desegregation of the Dallas County School System, and the affirmative duty of the defendants to enforce and implement the approved desegregation plan for the Dallas County School System.
52. There is no evidence that the Houghton-Mifflin Test, the Math Test, or any other test administered by the Dallas County School System is racially biased.
53. The testing procedures apply to and are required of all students at Valley Grande and at all other elementary schools within the Dallas County School System. Such testing and placements procedures have not resulted in segregated classrooms and have not arbitrarily placed students in levels where race has been a factor. Furthermore, to the extent that such tests have or might tend to have that result, those issues relate to the effectiveness of the desegregation plan and the action of these defendants in implementing that plan are issues to be litigated in the Lee Case and not this action.
54. There is no evidence before the Court that social promotion is desirable or beneficial to plaintiffs or other students.

CONCLUSIONS OF LAW
1. Jurisdiction over this case is proper under 28 U.S.C. §§ 1331, 1343(3), and 1343(4).

A. Parties
2. Before reaching the merits of this class action,[1] it is necessary to address the issue, raised by the defendants, whether the Dallas County Board of Education and the members of the board in their representative capacities are immune from suit under the eleventh amendment. The defendant-Dallas County Board of Education argues that, under Alabama law, a county school board is considered "`a quasi corporation, an independent agency of the state for the purposes enumerated in the statute'" which created the county boards of education. Sims v. Etowah County Board of Education, 337 So.2d 1310, 1315 (Ala.1976) (quoting Turk v. County Board of Education of Monroe County, 222 Ala. 177, 131 So. 436 (1930)). See Ala.Code §§ 16-8-1 to 16-8-43 (1975) (county boards of education). It argues that, as an agency of the State, the Dallas County Board is immune from suit under the eleventh amendment of the United *1336 States Constitution unless it consents to the suit. Alabama v. Pugh, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).
3. This argument, as the plaintiffs correctly point out, is not supported by the case law. In Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Court held that municipal corporations, which include municipalities and school boardsboth of which were recognized by the Court as "instrumentalit[ies] of state administration" id. at 696, 98 S.Ct. 2018 are subject to suit under section 1983. Id. at 690, 98 S.Ct. 2018. Section 1983 "creat[ed] . . . a civil remedy against state municipal corporations that infringed federal rights." Id. at 669, 98 S.Ct. at 2025. Therefore, the Dallas County School Board is properly named as a defendant in this suit.[2] Similarly, the complaint properly names, in their representative capacities, the members of the Dallas County Board of Education, Clarence James (the principal of Valley Grande School), and Frank Earnest (Superintendent of Schools). Nothing would bar a money judgment against these *1337 defendants in the right case. Monell, 436 U.S. at 700, 98 S.Ct. 2018.[3]

B. Section 1981 Claim
4. The sine qua non of a complaint under section 1981 is a showing of racial discrimination. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); see McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); accord Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (discriminatory intent required to show constitutional violation). The record in this case is clear that the testing procedures employed in the Dallas County School System are not administered on the basis of racial criteria. Students from all races are treated identically.
5. The Court recognizes that motive and intent are crucial in determining whether an alleged violation of section 1981 has occurred. See Id. But just because racial animus is important, Campbell v. Gadsden County District School Board, 534 F.2d 650, 654 n.8 (5th Cir. 1974), that does not suspend the application of Rule 56. Aladdin Oil Co. v. Texaco, Inc., 603 F.2d 1107, 1111-12 (5th Cir. 1979) (Rule 56 applied in antitrust action). In response to the motion for summary judgment the plaintiffs presented no significant probative evidence either to support the allegations of racial discrimination in the complaint or to show that a genuine issue as to a material fact exists. Simple dissatisfaction with the results of the testing does not translate into racial discrimination. The Court is satisfied that whatever the results of the academic placement testing is in Dallas County no racial animus is present. Accordingly, the defendants' motion for summary judgment as to the section 1981 claim is granted.[4]

C. Section 1983 Claim
6. The claim under section 1983 is likewise without merit. The plaintiffs argue that the testing procedures adopted by the school board deny the students' due process rights which are constitutionally protected. Due process, of course, means different things in different contexts. Before determining the question of what process is due it must be determined that some constitutionally protected interest in life, liberty, and property exists. Protected interests in property "are created and their dimensions are defined" by state law. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In Alabama, the state constitution provides all children with an entitlement to a public education. Ala.Const. art. XIV, § 256. The state requires school-aged children to attend school on a regular basis. Ala.Code § 16-28-3. If children between the ages of seven and sixteen fail to attend school "for *1338 the entire length of the school term in every scholastic year," id., the child's parents are liable for the child's failure to attend. Id. at § 16-28-2. In addition to these specific provisions Alabama law has extensive statutory and constitutional provisions regarding the creation, maintenance, and administration of a public school system. See generally title 16 of the Alabama Code and Ala.Const. art. XIV. Having chosen to extend the right to a public education to people of the plaintiffs' class generally the state may not impair that right without granting some "fundamentally fair procedures" to determine whether constitutionally protected interests are being infringed. Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension from school).
7. Under the facts of this case the Court holds that the placement testing utilized in this case does not infringe or impair the property rights of the students. Therefore, the requirements of the due process clause are never triggered. Placement tests are a necessary adjunct to educational administration if schools are to treat and teach students on an individual basis. No two students are alike. They have different needs and varying abilities. Although individualized tutoring would be desirable, financial constraints dictate that students be taught in groups. That being the case, each individual student would be likely to learn most effectively if the group with which he is included is presented material which is generally within his individual ability. The placement tests used by the defendants are a perfectly acceptable way to place students within instructional groups. The tests do not infringe any property interest of the plaintiffs. Goss v. Lopez, 419 U.S. at 574, 95 S.Ct. 729. If anything, the placement tests help to insure that students will utilize their property righttheir right to a public educationto the fullest. Through these tests the board of education is doing what it can to insure that no student is placed at a level which requires academic skills greater than those which he possesses.
8. Even if one were to assume that the placement tests did infringe upon the property interests which the plaintiffs have in a public education, no due process violation could be presented by this case. "`Once it is determined that due process applies, the question remains what process is due.'" Id. at 577, 95 S.Ct. at 738 (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). "[T]he interpretation and application of the Due Process Clause are intensely practical matters . . .." Id. at 578, 95 S.Ct. at 738. Moreover, because the administration of the public schools is left to the control of state and local authorities, as it should be, federal courts should thread gingerly when asked to interfere with the prerogatives of local authorities. Id. (citing Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)).
9. The fundamental requirements of due process are "some kind of notice and . . . some kind of hearing." Id. The timing and the content of the notice and the nature of the hearing are a function of the balancing which a court must undertake between the competing interests involved. The interest of an individual student is to be placed at the proper level. That is an interest of the school system, too. But the school system's interest is broader than proper placement. The school system is concerned with economy and efficiency of administration. These competing interests were, in the opinion of the Court, properly balanced by the grievance procedure which the school board used. Due process requires no more than that which the school board now offers. See pp. 1330-1331 supra.
10. Therefore, this Court holds that even if the administration of the placement tests did infringe the property rights of the plaintiffs no violation of due process occurred because the procedure for grievances *1339 which the school board uses affords both adequate notice and an opportunity for a hearing to aggrieved students. Since there was no constitutional violation of any right afforded these plaintiffs, a fortiori, the plaintiffs' claim under section 1983 must fail. Accordingly, it is the opinion of the Court that the defendants' motion for summary judgment as to the 1983 claim is due to be granted.

D. Pendent State Claim
11. Having decided all of the federal claims presented by the plaintiffs, the Court now comes to the pendent state claim alleged under Ala.Code § 16-1-13 (1975) (teaching pupils of disparate ability, background, and achievement).[5]United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (common nucleus of operative facts); Mobil Oil Corp. v. Kelley, 493 F.2d 784, 788 (5th Cir. 1974). The plaintiffs, in their complaint, allege that section 16-1-13 was violated when the defendants failed to consult the plaintiffs' parents and teachers prior to placing the plaintiffs in their respective levels upon their transfer to Valley Grande School. The record shows that the named plaintiffs were grouped according to the same procedure which had been used at their former school, Brantley School. See Findings of Fact ¶¶ 17 & 18. The placement system used at Brantley School was presumptively proper. And, in an effort to inform interested parents, the board policy at Valley Grande School is, and was, to meet with interested parents and to explain the non-graded approach used at Valley Grande School. Findings of Fact ¶ 21. Prior to the transfer of the named plaintiffs to Valley Grande School the non-graded pilot program was reviewed and approved by all concerned. Findings of Fact ¶¶ 15-16. Moreover, before the placement of the named plaintiffs at Valley Grande School was considered final, the board made every effort to meet with the parents of the plaintiffs and to explain the placement procedures to them. Findings of Fact ¶¶ 22-37. It is the studied conclusion of the Court that nothing which the defendants did while placing the students violates section 16-1-13. Accordingly, summary judgment is entered in favor of the defendants as to this portion of the complaint.

E. Judgment
12. It is the judgment of the Court that the defendants' motion for summary judgment as to the claims under 20 U.S.C. §§ 1601-1619, 42 U.S.C. §§ 1981, 1983 and Ala.Code § 16-1-13 is due to be granted. All relief which the plaintiffs pray for in their complaint is hereby denied. This order adjudicates all issues raised in this class action.
*1340 13. All costs of this action are taxed against the plaintiffs.
NOTES
[1] See the Order of the Court dated November 19, 1979 which certified this case as a class action.
[2] Sims v. Etowah County Bd. of Educ., 337 So.2d 1310 (Ala.1976), and the host of other cases which discuss the immunity of local school boards focus upon liability in tort, a state cause of action. Liability under both § 1981 and § 1983, however, which are part of the basis of the complaint in this case, are federally-created causes of action. See, e. g., Board of School Comm'r of Mobile County v. Caver, 355 So.2d 712 (Ala.1978) (tort liability exists because the Mobile County School Bd. is empowered to both sue and be sued); Enterprise City Bd. of Educ. v. Miller, 348 So.2d 782 (Ala.1977) (no tort actions against a city school board because Ala.Code, which created city school boards, does not mention any ability to be sued); Ala.Code § 16-8-40 (the county board of education "may sue and contract"; no mention of being sued). Since the immunity which the Dallas County Board of Education claims is limited to state-created tort actions, the immunity provided by state law does not bar a federally-created cause of action. Monell v. New York City Dept. of Social Serv., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

After reviewing the legislative history of § 1983 the Court's
analysis of the legislative history of the Civil Rights Act of 1871 compell[ed] the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.
Id. After reaching this conclusion the Court then observes that "[i]n the wake of our decisions, Congress not only has shown no hostility to federal court decisions against school boards, but it has indeed rejected efforts to strip the federal courts of jurisdiction over school boards." Id. at 696, 98 S.Ct. at 2039. See Atkinson v. Babcock School Dist., 460 F.Supp. 1190 (W.D.Pa.1978) (applying Monell and finding a claim for relief was properly pleaded against a school board); see, e. g., Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (§ 5 of the fourteenth amendment, which is the basis of § 1983, limits the eleventh amendment); Corpus v. Estelle, 605 F.2d 175, 179 (5th Cir. 1979) ("Congress successfully overcame the states' sovereign immunity by passing the [Civil Rights Attorney's Fees Award] Act under its section 5 power . . ..").
Like § 1983, which was enacted to enforce the fourteenth amendment, § 1981, which was enacted to enforce the thirteenth amendment, limits the scope of the eleventh amendment. The Civil Rights Act of 1866, of which § 1981 is a part, "was enacted as a means to enforce the Thirteenth Amendment's proclamation that "[n]either slavery nor involuntary servitude . . . shall exist within the United States, or any place subject to their jurisdiction.'" District of Columbia v. Carter, 409 U.S. 418, 421, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973) (quoting Jones v. Alfred H. Mayer Co., 392 U.S. 409, 437-38, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)). The thirteenth and the fourteenth amendments "`were intended to be, what they really are, limitations on the power of the States and enlargements of the power of Congress.'" Fitzpatrick v. Bitzer, 427 U.S. 445, 454, 96 S.Ct. 2666, 2670, 49 L.Ed.2d 614 (1976) (quoting Ex parte Virginia, 100 U.S. 339, 345, 25 L.Ed. 676 (1880)). See Hutto v. Finney, 437 U.S. 678, 693-94, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Legislative intent coupled with constitutional authority make it clear that the Civil Rights Acts of 1866 and 1971 limit eleventh-amendment immunity.
[3] All members of Congress who participated in the debate over § 1983 "proponents and opponents alikeknew that § 1983 would be applied to state officers and nonetheless stated that § 1983 was constitutional." Monell v. New York City Dept. of Soc. Serv., 436 U.S. 568, 700, 98 S.Ct. 2018, 2041, 56 L.Ed.2d 611 (1978).
[4] The complaint alleges that the placement testing has the purpose and intent of discriminating against the plaintiffs on the basis of race in violation of the Emergency School Aid Act. 20 U.S.C. §§ 1601-1619. As already noted, the Court finds no discriminatory intent associated with the placement testing. While the Court recognizes that discriminatory intent need not be shown under ESAA, Board of Educ. v. Harris, ___ U.S. ___, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979), the plaintiffs have failed to make any prima facie showing that the placement test has any racially disparate impact. Id. at ___, 100 S.Ct. at 369. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denial of his pleading, but his response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). No affidavit or deposition filed by the plaintiffs show a racially disparate impact caused by the placement exams, despite affidavits from the defendants denying any disparate impact.
[5] Ala.Code § 16-1-13 reads as follows:

§ 16-1-13. Teaching pupils of disparate ability, background and achievement.
Whenever any city, county or other local school board determines it to be in the best interest of the public school pupils of the local school system, it may prescribe and from time to time adjust and adapt and further prescribe the manner, method and procedure to be employed in classrooms for teaching pupils of disparate ability, background and achievement in the public schools within its jurisdiction. Its authority in this respect shall include but shall not be limited to prescribing the grouping and classification of students within the same grade level, based upon considerations of native ability as indicated by intelligence tests; the general academic achievement, and level of achievement in a particular subject area. Any such grouping of pupils within a class or grade shall be prescribed by the local board of education only after consultation with the superintendent of the school, teachers, students and parents of various pupils concerned, and the decision reached shall be solely within the discretion of the board. The local board may prescribe the times and hours of instruction for any grouping within schools and classrooms as it may consider advisable and may assign special teachers, prescribe special subjects or remedial courses, advanced courses, vocational courses and take such other action with respect to the time and place for teaching such separate groupings as it may consider in the best interest of the students and the entire student body of the school. (Acts 1963, No. 522, p. 1126.)