James D. STEWART, Plaintiff–Appellee,

v.

BALDWIN COUNTY BOARD OF EDUCATION; Laurens Jones; Carl E. Johnson; William L. Donaldson; L.E. Rockwell, M.D.; Ruth S. Underwood; J. Larry Newton, Defendants–Appellants.

No. 89–7353.

United States Court of Appeals, Eleventh Circuit.

Aug. 15, 1990.

1500

Norborne C. Stone, Jr., George R. Irvine, III, Bay Minette, Ala., for defendants-appellants.

Henry H. Caddell, Mobile, Ala., Jeremiah A. Collins, Virginia A. Seitz, Bredhoff & Kaiser, Washington, D.C., for plaintiff-appellee.

Before JOHNSON, HATCHETT and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This is a section 1983 case brought by James Stewart, a former employee of the Baldwin County Board of Education ("School Board"). Stewart was employed as a painter in the School Board's building maintenance department and had worked in that position for over three years. Stewart's complaint alleges that he was terminated for exercising his First Amendment freedoms of expression and association. The defendants (the School Board, Board members, and Superintendent) moved for summary judgment on the grounds of qualified immunity and Eleventh Amendment immunity. The district court denied the motion, and the defendants appealed. We conclude that the district court properly denied defendants' motion for summary judgment based on qualified immunity. We also affirm the district court's denial of Eleventh Amendment immunity to the School Board. Defendants also raise the claim that the School Board members are entitled to quasi-judicial absolute immunity; we conclude that the Supreme Court's decision in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), precludes such immunity.

## I. BACKGROUND

### A. *Facts*

On April 1, 1987, at approximately 3:35 p.m., Stewart, along with his co-workers in the maintenance department, attended a mandatory meeting of the maintenance shop employees to hear comments from the superintendent, Larry Newton (one of the defendants in this case), concerning a referendum on new school taxes in Baldwin County. At 4:00 p.m., the end of the normal work day, Stewart left the meeting, which was still in progress. It is not contested that Stewart's exit was quiet and nondisruptive; the Superintendent did not even know that Stewart had left the room until he was informed by Stewart's supervisor.

The next morning, Stewart's supervisor, Gherlin McDaniel, advised Stewart that Superintendent Newton wanted to see him. At that conference, Newton and McDaniel

confronted Stewart with his early departure from the previous day's meeting. They suggested to Stewart that such conduct showed a lack of interest regarding the future of the school system and asked whether Stewart was interested in resigning from his job. Stewart refused to resign. It is not disputed that the conference was somewhat heated and that "voices were raised" during the course of the meeting. The parties do disagree, however, as to whether Stewart was insubordinate during the conference.

On Friday, April 3, 1987, McDaniel wrote a recommendation to Newton that Stewart be terminated from employment with the School Board. McDaniel's recommendation stated as reasons for the proposed termination that Stewart had demonstrated a lack of concern for the school system by leaving the April 1 meeting before it had been concluded; that during the conference of the previous day Stewart had been insubordinate by continually interrupting the Superintendent and refusing to be quiet; and that Stewart should be terminated for other good and just causes. Superintendent Newton subsequently forwarded to Stewart a written notice of proposed termination. This notice set out as reasons for the termination that Stewart had been insubordinate; had neglected his duties; had used vile and demeaning language in reference to a supervising administrator; and had demonstrated a lack of concern for the school system by leaving the meeting called by the Superintendent before its conclusion.

### B. *Procedural History*

On March 29, 1989, Stewart filed this action under 42 U.S.C. § 1983, alleging that the School Board's termination of his employment violated his constitutional rights to freedom of expression and association. Stewart named as defendants the School Board itself; Superintendent Newton, sued in his individual and official capacities; defendants Johnson, Rockwell, and Underwood (current School Board members who participated in the decision to fire Stewart), sued individually and as members of the Board; defendants Jones and Donaldson (past School Board members who participated in the decision to fire Stewart), sued individually; and defendants Boothe, Sims, Williams, and Deese (current School Board members who did not participate in the decision to fire Stewart), sued as members of the Board. Stewart sought declaratory and injunctive relief, including reinstatement, backpay, and lost benefits; he also sought compensatory and punitive damages.

The defendants moved for summary judgment. Defendants claimed that the School Board and the members of the Board were entitled to absolute immunity under the Eleventh Amendment to the United States Constitution. They also argued that the individual Board members and the Superintendent, as sued in their personal capacities, were entitled to qualified immunity under the rule announced in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The plaintiff cross-moved for summary judgment, alleging that there was no factual dispute that Stewart was terminated because he departed early from the Superintendent's meeting, and that such activity was protected under the First Amendment. The district court, without opinion, denied both motions for summary judgment. Defendants now appeal the district court's denial of their motion for summary judgment; they bring their appeal under 28 U.S.C. § 1291.

### II. QUALIFIED IMMUNITY

 Defendants appeal the refusal of the district court to grant summary judgment in their favor on the basis of their qualified immunity defense. Only the individual defendants are involved in this part of the appeal; qualified immunity does not apply to the School Board or to the members of the Board as sued in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). This interlocutory order is immediately appealable under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86

L.Ed.2d 411 (1985); *Greason v. Kemp,* 891 F.2d 829, 831 n. 4 (11th Cir.1990).

The Supreme Court, in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), established the following test for determining whether a public official can claim qualified immunity: "[G]overnment officials ... generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Courts evaluate the official's conduct under an objective, reasonable person standard; the relevant question on a motion for summary judgment based on a defense of qualified immunity is whether a reasonable official could have believed his or her actions were lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred. *Anderson v. Creighton,* 483 U.S. 635, 642, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); *Herren v. Bowyer,* 850 F.2d 1543, 1545–46 (11th Cir.1988). Thus, the qualified immunity defense provides ample protection to all except the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

This familiar standard presents two distinct questions of law for this court to consider in determining whether the district court erred in refusing to grant summary judgment. First, we must determine whether the legal norms allegedly violated by the defendants were clearly established at the time the defendants acted. *Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988).[1] If the law that the defendants allegedly violated was not clearly established, then the defendants are entitled to qualified immunity. *See Daniel v. Taylor,* 808 F.2d 1401, 1403 (11th Cir.1986) (holding

that to be entitled to qualified immunity, defendants need only show that it is an unsettled question of law whether plaintiff had a right not to be detained without probable cause).

If the legal norms that the defendants are alleged to have violated were clearly established when the defendants' conduct occurred, then we must proceed to the second question of law in our analysis: whether the plaintiff has adduced evidence sufficient to create a genuine issue of fact as to whether the defendant engaged in conduct violative of the rights guaranteed by the clearly established law. *Bennett v. Parker,* 898 F.2d 1530, 1532–33 (11th Cir.1990); *Rich,* 841 F.2d at 1564. In addressing this question, we resolve all reasonable inferences of fact in favor of the plaintiff, as the plaintiff is the party who opposes the motion. *Goddard v. Urrea,* 847 F.2d 765, 767 (11th Cir.1988).

### A. *Implication of a Clearly Established Right*

■ Stewart argues that he was discharged from his employment because he refused to embrace the School Superintendent's position on an upcoming tax referendum and because he objected to the Superintendent's campaigning among the employees on this issue. Stewart claims that he expressed his objections to the Superintendent's position by walking out of an employee meeting conducted by the Superintendent, held for the purpose of discussing the tax referendum. Stewart argues that his discharge violated his clearly established constitutional right to communicate his disagreement with the Superintendent and his clearly established right not to be coerced into attending, on his own time, a meeting advocating a given political position.

---

**1.** *Rich,* 841 F.2d at 1563–64 (citing *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983)), sets out a two-step framework for applying *Harlow's* objective reasonableness test. In the first step, the defendants must prove they were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. The second step then shifts the burden to the plaintiff to show that the defendants' actions violated

clearly established constitutional law. Because there is no dispute in this case that the defendants were acting within the scope of their authority when they terminated Stewart, we address only the second part of the test, i.e. whether the plaintiff has demonstrated that the defendants engaged in conduct that violated Stewart's clearly established constitutional rights.

Prior law provides guidance in determining whether the defendants' actions violated clearly established constitutional rights. The Supreme Court, in *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039, noted that the appropriate inquiry is particularized and fact-specific; a generalized allegation of an abstract right is not sufficient. An official will be immune from liability if the applicable law was unclear or if a reasonable officer could have believed that his actions were lawful in light of the clearly established law and the information possessed by the officer. *McDaniel v. Woodard*, 886 F.2d 311, 314 (11th Cir.1989). Although the standard is fact-specific, it is not one of factual rigidity. The very conduct in question need not have been explicitly held to be unlawful prior to the time the official acted; rather, "in light of the preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039. *See also People of Three Mile Island v. Nuclear Regulatory Comm'rs.*, 747 F.2d 139, 144 (3d Cir.1984) ("Although officials need not 'predic[t] the future course of constitutional law' ... they are required to relate established law to analogous factual settings.") (citations omitted); *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988) (en banc); *Eastwood v. Dep't. of Corrections*, 846 F.2d 627, 630 (10th Cir.1988); *Lappe v. Loeffelholz*, 815 F.2d 1173, 1177 (8th Cir.1987). Using this standard, we must determine whether, under Stewart's version of the facts, the defendants in this case reasonably could have believed that discharging Stewart was lawful in light of the clearly established law.

An initial issue we must address in this case is whether it was clear at the time of Stewart's discharge that his conduct in walking out of the meeting amounted to protected speech. The law at the time of the discharge clearly established that certain forms of conduct are considered speech and are protected by the First Amendment. *See, e.g., Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293–94, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (assuming that overnight camping in a public park in connection with a demonstration in support of the homeless was expressive conduct protected by the First Amendment); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) (nude dancing is constitutionally protected expression); *Tinker v. Des Moines School District*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (wearing black armbands in school is akin to pure speech); *Brown v. Louisiana*, 383 U.S. 131, 141–42, 86 S.Ct. 719, 723–24, 15 L.Ed.2d 637 (1966) (sit-in by blacks in a "whites only" area to protest segregation was expression protected by First Amendment); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632–33, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943) (compulsory flag salute is a form of utterance within the protection of the First Amendment); *Florida Gulf Coast Bldg. & Constr. Traders Council*, 796 F.2d 1328, 1332 (11th Cir.1986) (distribution of handbills protected by First Amendment); *Monroe v. State Court of Fulton County*, 739 F.2d 568, 572 (11th Cir.1984) (burning American flag is a form of protected speech); *Leonard v. City of Columbus*, 705 F.2d 1299, 1303–04 (11th Cir.1983) (taking flag patch off of police uniform is protected speech).

The Supreme Court, in *Spence v. Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974), set out the following test for determining whether symbolic acts constitute speech for First Amendment purposes: there must be (1) an intent on the part of the actor to convey a particularized message, and (2) circumstances surrounding the act such that the likelihood is great that the message will be understood by those who view it. *Accord Monroe v. State Court of Fulton County*, 739 F.2d at 571. Stewart alleges that by leaving the meeting early he sought to communicate to his fellow employees that he "wanted to be able to make up [his] own mind on the tax referendum issue without pressure from [the Superintendent]" and that "an employee [has] the right to go home when the whistle [blows] and not stay around on his own time to listen to the Superintendent talk about an upcoming

election." Affidavit of Stewart. He also claims that he had spoken with his fellow employees prior to the meeting and had told them he planned to leave precisely at 4:00 p.m., the normal quitting time. All of these factors demonstrate that Stewart intended his departure to communicate a particularized message—that he objected to being required to listen to a campaign supporting the tax referendum.[2]

In addition, Stewart's supervisors undoubtedly received the message that Stewart objected to the proposed increase of the school taxes, or at least that he objected to the manner in which the Superintendent presented the issue to the employees. It is apparent that Stewart's supervisors were offended not by the bare act of Stewart's departure from the meeting, but rather by the message he wished to communicate. In his deposition, Superintendent Newton stated that Stewart violated none of his duties when he left the meeting at 4:00; it was within Stewart's prerogative to leave at 4:00, if he so desired. Yet Newton called Stewart into his office to discuss Stewart's early departure from the meeting. Newton testified that "if a person didn't want to hear what—any information concerning the raising of two hundred and ten million dollars for a system, then he probably didn't have any real dedication to the system, and I wanted to know why he didn't have an interest in the system." A fair inference from this testimony is that the Superintendent believed that Stewart's departure from the meeting signaled an unwillingness to support the Superintendent's position on the tax referendum and that any employee who did not support his position lacked concern for the system and could be called on the carpet for that reason.

We conclude that Stewart has adduced sufficient evidence to show that his departure from the Superintendent's meeting was intended to convey and did convey the message that he objected to the Superintendent's position and methods. Thus, Stewart's act of leaving the meeting was conduct "sufficiently imbued with elements of communication," *Spence*, 418 U.S. at 409, 94 S.Ct. at 2730, to implicate the protections guaranteed by the First Amendment.

■ Although the law is well-established that the state may not discharge a public employee in retaliation for speech protected under the First Amendment, *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983), the employee's right to freedom of speech is not absolute. *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989) (citing *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). The Supreme Court held, in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968), that a public employee's right to free speech is limited by the state's need to preserve efficient governmental functions. "This balancing is necessary in order to accomodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896. *Pickering* acknowledges that the discharge of an employee because of that employee's speech will not always be an illegal termination.

■ An employee's speech will be protected if it meets two requirements. First, the speech must be "fairly characterized as constituting speech on a matter of public concern." *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896–97. The court examines the content, form, and context of the employee's speech to determine whether it addresses a matter of public concern. *Id.* at 384–85, 107 S.Ct. at 2897. Second, the speech must pass muster under the *Pickering* balancing test: the employee's interest in making the statement must outweigh "the interest of the state, as an employer, in promoting the efficiency of the public

---

**2.** Stewart explained to the School Board, prior to his termination, that he left the meeting because he felt that he and the other members of the maintenance crew were being pressured to vote a certain way on the tax referendum.

services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35 *quoted in Rankin*, 483 U.S. at 384–85, 107 S.Ct. at 2896–98.

Stewart's speech in opposition to the Superintendent's position on the upcoming tax referendum clearly implicates a matter of public concern. Indeed, the Supreme Court in *Pickering* held that the issue of a proposed school tax was a matter of public concern. *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736.

The *Pickering* balance is similarly clear in this case; it is clear that Stewart's interest in making his statement outweighs any interest articulated by the Superintendent or the School Board in the efficient and effective operation of the school system's maintenance department. Stewart's speech raised the important issue of an employee's freedom to disagree with his supervisor on a matter submitted to a county-wide election. It is not contested that Stewart raised this issue in a nondisruptive manner. Moreover, the defendants cannot point to any disruption, inefficiency, or ineffectiveness in the general workplace that was caused by Stewart's speech. They do not allege that Stewart violated any of his duties by leaving the meeting when he did.

This case is remarkably similar to *Pickering v. Board of Education*, 391 U.S. 563, 571–73, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968), in which the Court held that a teacher could not be discharged on the basis of speech criticizing the School Board's sponsorship of a school bond referendum. The Court held that the school tax issue was one of public concern and that there was no showing that the teacher's speech had impeded the teacher's performance or interfered with the operations of the schools generally. While we recognize that the *Pickering* balancing test is necessarily conducted on a case-by-case basis, and thus will often result in a balancing of interests that is insufficiently one-sided so as to clearly establish the plaintiff's constitutional right, *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1323 (11th Cir.1989), we conclude that such clarity is

present in this case. Defendants can point to no interests which the squelching of Stewart's speech served in this case, and, in addition, there is Supreme Court precedent that is directly on point. We therefore conclude that, assuming that Stewart was discharged because of his speech (as we must assume in this summary judgment posture), Stewart clearly prevails on the *Pickering* balancing test.

We conclude, therefore, that Stewart has articulated a clearly established constitutional right to walk out of the Superintendent's meeting as an expression of opposition to the Superintendent's campaign in favor of the proposed tax referendum. The defendants could not reasonably have believed that it would be lawful to discharge Stewart for expressing opposition to the Superintendent's position on the tax referendum. Thus, we proceed to the second step of our analysis, i.e. whether Stewart has raised a genuine issue of material fact as to whether the defendants committed acts which violated the foregoing clearly established right.

### B. *Genuine Issues of Fact as to Whether Defendants Violated Stewart's Clearly Established Rights*

It is not sufficient that Stewart has demonstrated a clearly established constitutional right; to avoid summary judgment, Stewart must also adduce sufficient evidence to create a genuine issue of material fact as to whether the defendants acted so as to deprive him of his clearly established rights. *Rich v. Dollar*, 841 F.2d at 1564.

The issue of whether qualified immunity is proper in this case turns on a question of fact: was Stewart discharged from his employment because he walked out of the Superintendent's meeting? Defendants maintain that Stewart was not discharged for walking out of the meeting; they argue that the termination came in response to Stewart's insubordination during his private meeting with Newton and McDaniel.

Stewart denies being insubordinate and contends that this reason for his discharge is pretextual.[3] Stewart has produced evidence, in the form of his own affidavit and the depositions of Superintendent Newton and Supervisor McDaniel, that supports his contentions. Superintendent Newton testified before the School Board that the tax referendum was important to the school system and that all school personnel should have been interested in getting the referendum passed. It is undisputed that Superintendent Newton called Stewart into his office to speak with him about his "lack of interest in the system," and during the course of this meeting Newton asked Stewart for his resignation. Moreover, Supervisor McDaniel formally recommended that Stewart be discharged for three reasons; the first reason listed was Stewart's lack of concern for the school system, as demonstrated by his early departure from the meeting. All of these factors support Stewart's contention that he was discharged for exercising his right to speak out on a matter of public concern.

Stewart has presented sufficient evidence from which a jury could find that the defendants discharged Stewart in retaliation for Stewart's exercise of his clearly established constitutional rights. We conclude that the district court correctly denied summary judgment on the qualified immunity issue, and thus we affirm[4] on this issue.

## III. QUASI–JUDICIAL ABSOLUTE IMMUNITY

 Defendants contend that the School Board members, as sued in their individual capacities, are entitled to absolute immunity from suit because they were acting in a "quasi-judicial" role when they discharged Stewart. We have jurisdiction over this issue under the authority of *Nixon v. Fitzgerald*, 457 U.S. 731, 741–43, 102 S.Ct. 2690, 2697–98, 73 L.Ed.2d 349 (1982) (denial of claim of absolute immunity immediately appealable under the collateral order doctrine); *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979) (same); *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (same). For the following reasons, we conclude that the members of the School Board are not protected by absolute, quasi-judicial immunity.

It is well-established that judges are immune from liability for damages for acts committed within their judicial jurisdiction. *See Cleavinger v. Saxner*, 474 U.S. 193, 199, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985) (citing *Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967)). The Supreme Court has held that this judicial immunity may protect certain executive and administrative personnel whose duties are "classically adjudicatory." *Cleavinger*, 474 U.S. at 201–04, 106 S.Ct. at 500–02.

---

3. We decline to entertain defendants' suggestion that the administrative proceedings may preclude plaintiff's assertion that his protected speech was a substantial factor motivating defendants' discharge of him. Defendants have not adequately briefed the issue before this court. Nor was the issue adequately presented to the district court in support of defendants' motion for summary judgment. Moreover, defendants' reply brief to this court acknowledges that the issue was raised in a different context in the district court and is still pending. We express no opinion on the merits of the preclusion issue or on its preservation in the district court.

4. Several panels of this court have indicated that the proper disposition in this context is dismissal of the appeal on jurisdictional grounds, rather than affirming the district court's denial of summary judgment. These panels have addressed the qualified immunity issue, have concluded that the district court properly denied summary judgment because the summary judgment record revealed genuine issues of fact as to whether or not the defendant committed the acts which would have violated clearly established constitutional law, and then have indicated that the proper disposition of the appeal was dismissal on jurisdictional grounds. *Bennett v. Parker*, 898 F.2d 1530 (11th Cir.1990); *Hudgins v. City of Ashburn, Ga.*, 890 F.2d 396, 403 (11th Cir.1989); *Goddard v. Urrea*, 847 F.2d 765 (11th Cir.1988). Other panels of this court have affirmed the district court's denial of summary judgment. *Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990); *Waldrop v. Evans*, 871 F.2d 1030 (11th Cir.1989). In this case, the outcome is not affected by the label we attach to the disposition. *See also Peppers v. Coats*, 887 F.2d 1493, 1496 n. 7 (11th Cir.1989).

However, the Court has explicitly declined to extend absolute judicial immunity protection to actions taken by school board members. In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Court noted that school board members function as "adjudicators in the school disciplinary process," and they must "judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations." *Id.* at 319, 95 S.Ct. at 999. However, despite the school board's adjudicative function, the Court held that board members were to be protected by qualified immunity only: "[A]bsolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." *Id.* at 320, 95 S.Ct. at 1000. *See also Cleavinger,* 474 U.S. at 204–05, 106 S.Ct. at 502 (explaining the Court's holding in *Wood* and relying on *Wood*'s holding to deny absolute judicial immunity to a prison's Institution Discipline Committee).

Although this case involves a school board's decision to discharge an employee rather than an instance of student discipline, as was involved in *Wood,* we conclude that the function of the school board in this case was substantially similar to the function of the board in *Wood.* The Court's ruling in *Wood* therefore precludes an extension of absolute immunity to the defendants in this case.

## IV. ELEVENTH AMENDMENT IMMUNITY

Appellants argue that the School Board and the members of the Board as sued in their official capacities are entitled to absolute immunity under the Eleventh Amendment. Before we reach the merits of the immunity issue, however, we must first determine whether we have jurisidiction to hear an interlocutory appeal of the district court's denial of Eleventh Amendment immunity.

### A. *Jurisdiction*

■ 28 U.S.C. § 1291 vests appellate courts with "jurisdiction of appeals from all final decisions of the district courts ... except where a direct review may be had in the Supreme Court." Ordinarily, a final, appealable decision is one which "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945). Denial of a motion for summary judgment is not ordinarily a "final" decision within the meaning of section 1291 because the case will continue forward in the district court. *See, e.g., Jones v. St. Paul Fire & Marine Ins. Co.,* 108 F.2d 123, 125 (5th Cir.1939).[5] However, the Supreme Court recognizes a small class of interlocutory orders, referred to as "collateral orders," which are offshoots of the principal litigation, and which are immediately appealable without regard to the posture of the underlying case. *See Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

There is currently a disagreement among the circuits as to whether a denial of Eleventh Amendment immunity is an immediately appealable collateral order. *Compare Eng v. Coughlin,* 858 F.2d 889, 893–95 (2d Cir.1988) (holding that denial of Eleventh Amendment immunity is an appealable collateral order); *Minotti v. Lensink,* 798 F.2d 607, 608 (2d Cir.1986) (same); *Coakley v. Welch,* 877 F.2d 304, 305 (4th Cir.1989) (same); *Loya v. Texas Dept. of Corrections,* 878 F.2d 860, 861 (5th Cir. 1989) (same), *with Libby v. Marshall,* 833 F.2d 402, 405–07 (1st Cir.1987) (holding that denial of Eleventh Amendment immunity is not immediately appealable under the collateral order doctrine).

■ Because the parties have not raised or argued the question of jurisdiction, we conclude that we should not under-

---

**5.** This case was decided prior to the close of business on September 30, 1981, and is binding

precedent under *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

take to resolve it at this time. We do, however, have discretion to assume pendent appellate jurisdiction over this issue. Pendent jurisdiction is properly exercised over nonappealable decisions of the district court when the reviewing court already has jurisdiction over one issue in the case. *See Myers v. Gilman Paper Corp.*, 544 F.2d 837, 847 (5th Cir.1977); *Broughton v. Courtney*, 861 F.2d 639, 641 n. 1 (11th Cir.1988). *See also* 9 *Moore's Federal Practice* ¶ 110.25 (noting that "once a case is lawfully before a court of appeals, it does not lack power to do what plainly ought to be done"). Pendent jurisdiction over the Eleventh Amendment immunity question is appropriate in this case because of considerations of judicial economy.

### B. *Eleventh Amendment Immunity*

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against any one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

The Eleventh Amendment protects the sovereignty of the states by prohibiting suits when recovery would be paid from state funds. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). Although the language of the Amendment encompasses only suits brought against a state by citizens of another state, the Supreme Court has held that it also bars suits against a state by its own citizens. *Hans v. Louisiana*, 134 U.S. 1, 10, 10 S.Ct. 504, 505, 33 L.Ed. 842 (1890). The Amendment's bar to suits in federal courts extends both to states and to state officials in appropriate circumstances, but it does not extend to counties, municipal corporations, or other political subdivisions of the state. *Mt. Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977). Whether a local school board is protected by Eleventh Amendment immunity, therefore, turns on the question of whether the board is properly classified as an "arm of the State" or

as a "municipal corporation or other political subdivision." *Id.* Although the ultimate question of whether the state is "the real party in interest" is one of federal law, not state law, *see Howlett v. Rose,* —— U.S. ——, ——, 110 S.Ct. 2430, 2436, 110 L.Ed.2d 332 (1990) ("To the extent that the [state] law of sovereign immunity reflects a substantive disagreement with the extent to which governmental entities should be held liable for their constitutional violations, that disagreement cannot override the dictates of federal law."); *Hander v. San Jacinto Junior College*, 519 F.2d 273, 279 (5th Cir.1975), this court must analyze the board's function and character as established by state law in order to determine whether the school board is an arm of the state and thus protected by Eleventh Amendment immunity. *Fouche v. Jekyll Island–State Park Authority*, 713 F.2d 1518, 1520 (11th Cir.1983).

Recent cases by this court focus on three factors in determining whether the entity in question is an arm of the state: (1) how the state law defines the entity; (2) the degree of state control over the entity; and (3) the entity's fiscal autonomy—i.e., where the entity derives its funds and who is responsible for judgments against the entity. *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir.1985); *Tuveson v. Florida Governor's Council on Indian Affairs*, 734 F.2d 730, 732 (11th Cir.1984); *Fouche*, 713 F.2d at 1520 (11th Cir.1983). These cases suggest that when the entity's budget is submitted to the state legislature for approval, it is presumed for purposes of the last two factors that the entity is an agency of the state. *Harden*, 760 F.2d at 1163–1164 (citing *Fouche*, 713 F.2d at 1520).

The Supreme Court in *Mt. Healthy*, looking to Ohio state law, found that the school board was not entitled to Eleventh Amendment immunity:

> Under Ohio law the "State" does not include "political subdivisions," and "political subdivisions" do include local school districts. Petitioner is but one of

many local school boards within the State of Ohio. It is subject to some guidance from the State Board of Education and receives a significant amount of money from the State. But local school boards have extensive powers to issue bonds and to levy taxes within certain restrictions of state law. On balance, the record before us indicates that a local school board of education is more like a county or city than it is like an arm of the state.

*Mt. Healthy,* 429 U.S. at 280–81, 97 S.Ct. at 572–73.[6] Using a similar analysis, this court has previously rejected claims by local boards of education in Florida, Mississippi, and Louisiana that they are entitled to Eleventh Amendment protection. *See Travelers Indemnity Co. v. School Bd. of Dade County,* 666 F.2d 505 (11th Cir.1982) (Florida); *Moore v. Tangipahoa Parish School Bd.,* 594 F.2d 489, 493–94 (5th Cir. 1979) (Louisiana); *Campbell v. Gadsden County Dist. School Bd.,* 534 F.2d 650, 655–56 (5th Cir.1976) (Florida); *Adams v. Rankin County Bd. of Educ.,* 524 F.2d 928, 929 (5th Cir.1975) (per curiam) (Mississippi). These cases noted that state law gave the school boards at issue a substantial amount of control over their own affairs, e.g., the boards possessed power to contract, to sue and be sued, to purchase and sell property, to borrow funds, and to levy and collect taxes. *See Moore,* 594 F.2d at 493–94; *Travelers Indemnity Co.,* 666 F.2d at 507–08. These cases also placed considerable significance on the fact that the individual school boards had the means to raise funds, so that any judgment for the plaintiff could be paid out of local funding rather than out of the state treasury. *See Adams,* 524 F.2d at 929 & n. 4; *Travelers Indemnity Co.,* 666 F.2d at 509.

We conclude that the Baldwin County Board of Education, like the school boards of Florida, Louisiana, and Mississippi discussed above, is not an arm or an alter ego of the state.

County school boards in Alabama possess a significant amount of flexibility in raising local funding. The board's authority to manage its own finances includes the ability to raise revenues by selling interest-bearing tax anticipation warrants, Ala.Code § 16–13–70, *et seq.* (1988); the statutory authorization to expend money raised by taxes in support of public schools in the district or county in which it was raised, *id.* at § 16–13–32; the authorization to spend revenues from county sales and use-tax funds for educational purposes, *id.* at § 16–13–37; § 16–13–145; and the authorization to borrow funds, *id.* at § 16–13–145; § 16–13–211. In addition, the school boards are required to hold "a meeting for the purpose of giving the public an opportunity of presenting to the board matters relating to the allotment of public school funds." *Id.* at § 16–8–3. It is clear that Alabama school boards have a degree of fiscal autonomy comparable to that of the school boards at issue in *Mt. Healthy* (received significant amount of money from the state, but had extensive powers to issue bonds and to levy taxes within certain restrictions of state law), *Moore* (had power to sue and be sued, to purchase and sell property, to borrow money, to levy taxes), and *Adams* (had local funding primarily through an ad valorem tax, which was supplemented by the state if insufficient, and had flexible tax structure allowing the board to tap local resources when increased resources were necessary). Consequently, even though the school boards are required to submit their budgets to the state superintendent for approval, *id.* at § 16–13–140,

**6.** That Alabama state courts provide county boards of education with sovereign immunity in state tort law actions does not require a similar treatment under the Eleventh Amendment. The Supreme Court's resolution in *Mt. Healthy* is instructive. At the time that *Mt. Healthy* was decided, the case law in Ohio was clear that a local school board was cloaked in sovereign immunity to the same degree as the state itself from suits arising in tort. *See, e.g., Baird v. Hosmer,* 46 Ohio St.2d 273, 347 N.E.2d 533, 535 (1976); *Salyers v. Burkhart,* 47 Ohio App.2d 90, 352 N.E.2d 156, 158–59 (1974), *aff'd,* 44 Ohio St.2d 186, 339 N.E.2d 652 (1975); *Hall v. Columbus Bd. of Educ.,* 32 Ohio App.2d 297, 290 N.E.2d 580, 582–83 (1972). Consequently, defendant's attempt to conflate sovereign immunity with regard to a state-created tort with Eleventh Amendment immunity for a federal cause of action is unavailing. *See Smith v. Dallas County Bd. of Educ.,* 480 F.Supp. 1324, 1336 n. 2 (S.D.Ala.1979). For similar reasons, defendant's claim that the Alabama constitution shields it with Eleventh Amendment immunity is in error.

it cannot be said that a judgment against a county school board will come from state funds.

Moreover, the county school boards in Alabama have the power to establish general education policy for the schools, *id.* at §§ 16-8-10, 16-8-28; they possess general administration and supervision responsibility for the schools, *id.* at §§ 16-8-8, 16-8-9; and they are imbued with the authority to assign teachers and to place students, *Opinion of the Justices*, 276 Ala. 239, 160 So.2d 648, 650-51 (1964). Additionally, the boards are subject to a significant amount of local control. Board members are elected by "the qualified electors of the county", Ala.Code at § 16-8-1, and they receive compensation from the public funds of the county, *id.* at § 16-8-5,

Finally, it is instructive that at least four federal district courts sitting in Alabama, in addition to the district court who ruled below, have held that the county school boards are not entitled to Eleventh Amendment immunity. *Smith v. Dallas County Bd. of Educ.*, 480 F.Supp. 1324, 1335-36 & n. 2 (S.D.Ala.1979) (Hand, J.); *Rolin v. Escambia County Bd. of Educ.*, No. 88-0314-AH (S.D.Ala.) (Howard, J.); *Andrews v. Coffee County Bd. of Educ.*, No. 88-D-1095-S (M.D.Ala.1988) (Dubina, J.); *Coleman v. Lowndes County Bd. of Educ.*, No. 88-V-220-N (M.D.Ala.1988) (Varner, J.). To the extent that these decisions construe the role and function of Alabama county boards of education under state law, we properly accord some deference to the evaluation of the local district judges. *See Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989); *Moore*, 594 F.2d at 494.

We conclude, therefore, that the Baldwin County Board of Education is not an "arm of the State" for purposes of Eleventh Amendment immunity, and we affirm the district court's denial of summary judgment on the basis of such immunity.[7]

## V. CONCLUSION

We conclude that the district court correctly denied the defendants' claims of qualified immunity and Eleventh Amendment immunity. In addition, we hold that the defendants are not entitled to quasi-judicial absolute immunity. The judgment of the district court is therefore

AFFIRMED.

HATCHETT, Circuit Judge, specially concurring:

I join in affirming the district court and returning this case to that court for factual development because the issue of why the school board fired Stewart precluded summary judgment. Consequently, I would dismiss the appeal. *Goddard v. Urrea*, 847 F.2d 765 (11th Cir.1988).

Two additional comments are in order: (1) where material factual issues are in dispute, it is risky for the district court to rely on one party's "version of the facts" to resolve any issue in the case; (2) the practice whereby defendants create material factual issues in the district court, lose on their summary judgment motion based on immunity because of the factual disputes, but then argue on appeal that the district court should be reversed because on the plaintiff's "version of the facts" no clearly established right has been shown, is unacceptable.

---

7. Defendants argue that this court's reference to the role of Alabama county boards of education in *Jaffree v. Wallace*, 705 F.2d 1526, 1533 (11th Cir.1983) (noting that "[t]he Alabama County School Boards are creatures of the State and are controlled by the State"), controls our decision in this case. However, our comment in *Jaffree* was with regard to whether or not the school systems could be considered state actors. This determination is completely separate from and has no independent bearing on a determination as to whether a county defendant is a state defendant for purposes of the Eleventh Amendment. *Edelman v. Jordan*, 415 U.S. 651, 667 n. 12, 94 S.Ct. 1347, 1358 n. 12, 39 L.Ed.2d 662 (1974) ("while county action is generally state action for purposes of the Fourteenth Amendment, a county defendant is not necessarily a state defendant for purposes of the Eleventh Amendment"); *Campbell v. Gadsden County District School Bd.*, 534 F.2d 650, 655 (5th Cir. 1976).