962 F.2d 1563
 Robert Jeff ADAMS, Sr., Personal Representative for the
Estate of Donald Demasco Adams, Sr., Plaintiff-Appellee,
v.
ST. LUCIE COUNTY SHERIFF'S DEPARTMENT, Robert C. Knowles,
Sheriff, Donnie Ingram, Defendants,
J.M. Lindsey, Robert Soesbe, Defendants-Appellants.
 No. 91-5137.
 United States Court of Appeals,
Eleventh Circuit.
 June 15, 1992.
As Amended Aug. 12, 1992.
 
 Julius F. Parker, Jr., Tallahassee, Fla., for defendants-appellants.
 Evan I. Fetterman & Assoc., Salvatore Scibetta, North Palm Beach, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HATCHETT and EDMONDSON, Circuit Judges, and HILL, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In affirming the district court, we reject the appellant-deputy sheriffs' contention that intentionally ramming the automobile of a fleeing misdemeanant, causing it to crash (killing an occupant) did not constitute a seizure under the Fourth Amendment and did not violate clearly established rights of which a deputy sheriff would have known.I. FACTS
 
 
 2
 In order to investigate reports of a petty theft, Deputy Sheriff Donnie Ingram of the St. Lucie County Sheriff's Department stopped an automobile on May 8, 1985, driven by Robert Adams, Jr. Donald Demasco Adams, Sr. was a passenger in the automobile's back seat. After being stopped, Robert approached Ingram's patrol car and informed Ingram that he was driving without a valid license in order to take the former operator of the automobile home. Ingram radioed the communications center to report the stop and learned that a warrant for Robert's arrest was outstanding for failure to appear in court on the misdemeanor offense of petty theft. No warrants had been issued for Donald's arrest.
 
 
 3
 Deputy Ingram, who on previous occasions had stopped and then released Robert, told Robert that he would have to go to jail. Robert stated that Ingram knew his identity and address, and returned to his automobile to drive away. Following these comments, a high-speed chase ensued through a residential neighborhood. Deputy Sheriff Robert Soesbe joined in the chase which covered approximately ten miles. During the chase, Soesbe asked J.M. Lindsey, a supervisor with the sheriff's department, whether he should try to "take out" the automobile. Lindsey advised Soesbe to shoot a bullet through the radiator of the automobile. Continuing the chase, Soesbe intentionally rammed the automobile several times. After the last contact between the automobiles, the Adams automobile went out of control, struck a telephone pole and a house, and was demolished. The driver, Robert, walked away with minor injuries, but his brother, Donald, died from injuries sustained in the crash.
 
 
 4
 The personal representative for the estate of Donald (the decedent's representative) brought this action against five defendants: Ingram, Soesbe, Lindsey, Sheriff Robert Knowles, and St. Lucie County, Florida. The amended complaint alleged that the conduct of the sheriff and the deputies was intentional, malicious, willful, wanton, and in reckless disregard of Donald's rights, or grossly negligent in that this conduct shocks the conscience and is fundamentally offensive to civilized society. Additionally, the amended complaint alleged that the conduct violated Robert's Fourth Amendment right to be free from unreasonable seizures.
 
 
 5
 Before trial, the claims against St. Lucie County were dismissed, and the court entered summary judgment in favor of Sheriff Knowles who was being sued only in his official capacity. Additionally, the court granted summary judgment in favor of Soesbe, Ingram, and Lindsey as to claims brought against them in their official capacities. The case proceeded to trial on the claims brought against Soesbe, Ingram, and Lindsey in their individual capacities. At the close of evidence, the court directed a verdit in favor of Ingram. The jury found that no constitutional violation occurred and returned verdicts in favor of Lindsey and Soesbe. On November 1, 1989, after a hearing on post-trial motions, the district court granted a new trial. Lindsey and Soesbe attempted to appeal on the basis that the granting of a new trial in effect denied the qualified immunity defense. This court declined to accept jurisdiction. The deputies then filed a motion for summary judgment on the basis of qualified immunity. The district court denied the motion for summary judgment.
 
 II. ISSUE
 
 6
 The issue is whether the district court erred in denying the deputies' motion for summary judgment based on a claim of qualified immunity.
 
 III. CONTENTIONS
 
 7
 The deputies contend that they did not violate clearly established law of which a reasonable law enforcement officer would have been aware and were thus entitled to summary judgment on the basis of qualified immunity. On the other hand, the decedent's representative contends that the law was clearly established at the time of the incident, and that it would have been apparent to a reasonable officer operating under similar circumstances that the deputies' actions constituted an unreasonable seizure violative of the Fourth Amendment.
 
 IV. DISCUSSION
 
 8
 Specifically, the deputies contend that before the date of the incident in this case, the law was not clearly established that a law enforcement officer's intentional ramming of an automobile during a high-speed chase, causing it to crash, and thereby terminating the freedom of movement of a passenger in the automobile constituted an unreasonable seizure violative of the Fourth Amendment.[1]
 
 
 9
 In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. This objective standard which refined the general announcement of a qualified immunity rule in Butz v. Economou, 438 U.S. 478, 507-08, 98 S.Ct. 2894, 2911-2912, 57 L.Ed.2d 895 (1978), was created to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. In Davis v. Scherer, 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984), the Supreme Court reaffirmed the objective reasonableness standard created in Harlow and also held that "[n]o other circumstances are relevant in the issue of qualified immunity." Davis, 468 U.S. at 191, 104 S.Ct. at 3017.
 
 
 10
 To ensure that insubstantial claims were decided at the summary judgment phase, the Supreme Court in Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) held "that a district court's denial of a claim of qualified immunity to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." Mitchell, 472 U.S. at 530, 105 S.Ct. at 2817. The Supreme Court pointed out in Mitchell that the entitlement of qualified immunity "is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815.
 
 
 11
 The Eleventh Circuit followed the "immunity from suit" rationale of Mitchell in Ansley v. Heinrich, 925 F.2d 1339 (11th Cir.1991) when it held that
 
 
 12
 qualified immunity is a question of law that may be asserted in three ways: (1) on a pretrial motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim; (2) as an affirmative defense in the request for judgment on the pleading pursuant to Federal Rule of Civil Procedure 12(c); or (3) on a summary judgment motion pursuant to Federal Rule of Civil Procedure 56(e). All three motions precede the trial and require the district court to rule as a matter of law, whether the official is entitled to the defense of qualified immunity.
 
 
 13
 Ansley, 925 F.2d at 1347 (citations omitted). The court concluded in Ansley that "[t]he Supreme Court's qualified immunity precedent aims at one goal: to keep the public official out of the courtroom, free to exercise discretionary duties under clearly established law without the constant threat of lawsuits." Ansley, 925 F.2d at 1345.
 
 
 14
 This court must determine as a matter of law whether the deputies are entitled to qualified immunity before the trial in order to keep them out of the trial if possible. See Mitchell, 472 U.S. at 526, 105 S.Ct. at 2815; Ansley, 925 F.2d at 1347. If this court reverses the district court's denial of the motion for summary judgment, the deputies are entitled to qualified immunity and the case is at an end. See Mitchell, 472 U.S. at 528, 105 S.Ct. at 2816; Ansley, 925 F.2d at 1348. On the other hand, if this court affirms the district court's denial of the motion for summary judgment, the deputies are not entitled to qualified immunity, and the jury should determine the factual issues without further mention of qualified immunity.[2] See Ansley, 925 F.2d at 1348.
 
 
 15
 The objective reasonableness standard announced in Harlow afford broad qualified immunity protection to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). In applying the standard, this court must "conduct its review through the eyes of an objective, reasonable government official." Nicholson v. Georgia Dept. of Human Resources, 918 F.2d 145, 147 (11th Cir.1990). The relevant inquiry is "could a reasonable official have believed his or her actions to be lawful in light of clearly established law and the information possessed by the official at the time the conduct occurred." Nicholson, 918 F.2d at 147. The court further defined the relevant inquiry in Nicholson with the statement that "[u]nless it can be said that the state of the law was of such clarity that a reasonable official should have been on notice that his or her challenged conduct was unlawful, that official is entitled to qualified immunity." Nicholson, 918 F.2d at 147; see also Clark v. Evans, 840 F.2d 876, 880 (11th Cir.1988).
 
 
 16
 The Supreme Court revisited its objective reasonableness standard in Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) to define the term "clearly established" as used in the language of Harlow. The Supreme Court stated that
 
 
 17
 [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law, the unlawfulness must be apparent.
 
 
 18
 Anderson, 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted). In accord with Anderson, the Eleventh Circuit has stated that
 
 
 19
 the plaintiff must draw the court's attention to a more particularized and fact specific inquiry. Under this inquiry, the plaintiff need not point to one or more cases that resolve the precise factual issues at issue in his or her case. Although the standard is fact specific, it is not one of factual rigidity.
 
 
 20
 Nicholson, 918 F.2d at 147 (citations omitted). The holding of Anderson, adopted in Nicholson, seeks a balance between unnecessarily burdening officials with the responsibility of divining what general constitutional and statutory terms might require and unreasonably failing to assess liability unless the specific action has been found unlawful. See Anderson, 483 U.S. at 639-40, 107 S.Ct. at 3038-39. Officials are required, however, to relate established law to analogous factual settings. People of Three Mile Island v. Nuclear Regulatory Commissioners, 747 F.2d 139, 144 (3d Cir.1984).
 
 
 21
 This court held in Rich v. Dollar, 841 F.2d 1558 (11th Cir.1988) that the objective reasonableness standard for qualified immunity is to be applied through the use of the following two-part analysis:
 
 
 22
 (1) The defendant public official must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' (2) Once the defendant public official satisfies his burden of moving forth with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions 'violated clearly established constitutional laws.'
 
 
 23
 Rich, 841 F.2d at 1563-64 (quoting Zeigler v. Jackson, 716 F.2d 847 (11th Cir.1983) (per curiam)). Additionally, this court noted in Rich that "a government official can prove he acted within the scope of his discretionary authority by showing 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.' " Rich, 841 F.2d at 1564 (quoting Barker v. Norman, 651 F.2d 1107, 1121 (5th Cir.Unit A 1981).
 
 
 24
 The deputies have satisfied the first prong of the Rich analysis since they were clearly acting within the scope of their discretionary authority when the allegedly wrongful acts occurred. It is axiomatic that a law enforcement officer has the discretionary authority to pursue and apprehend a fleeing suspected offender. The deputies' actions were undertaken pursuant to the performance of their duties since Robert was driving without a valid license and a warrant for his arrest was outstanding.
 
 
 25
 The second prong of the objective reasonableness test poses the following two questions of law which must be answered: (1) what was the clearly established law at the time of the deputies' actions, and (2) whether the deputies' conduct violated that clearly established law? Rich, 841 F.2d at 1564. To decide whether, at the time of this incident, persons in a fleeing car whose driver was suspected of a misdemeanor had a clearly established right not to be subjected to intentional ramming from a police car at high speed, the court must look to established law in the area. See Greason v. Kemp, 891 F.2d 829, 833 (11th Cir.1990).
 
 
 26
 In surveying the law in this area, we begin with Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) which was decided approximately six weeks before the time of the incident involved in this case. In Garner, a law enforcement officer shot an unarmed fleeing suspected felon in order to prevent his escape. The Supreme Court held in Garner that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the fourth amendment." Garner, 471 U.S. at 7, 105 S.Ct. at 1699. Additionally, the Supreme Court held in Garner that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.... A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." Garner, 471 U.S. at 11, 105 S.Ct. at 1701. The Supreme Court also emphasized in Garner that it has long been the common law rule that the use of deadly force to apprehend a misdemeanant is forbidden since such action was disproportionately severe. Garner, 471 U.S. at 15, 105 S.Ct. at 1703. In this case, the deputies used a police car as a deadly weapon instead of the usual weapon--a gun.
 
 
 27
 This court held in Stewart v. Baldwin County Board of Education, 908 F.2d 1499 (11th Cir.1990) that "[t]he very conduct in question need not have been explicitly held to be unlawful prior to the time the official acted; rather, 'in light of the preexisting law the unlawfulness must be apparent.' " Stewart, 908 F.2d at 1504 (quoting Anderson, 483 U.S. at 640, 107 S.Ct. at 3039). Additionally, the court in Stewart cited with approval People of Three Mile Island which held that "[a]lthough officials need not 'predic[t] the future course of constitutional law,' they are required to relate established law to analogous factual settings." People of Three Mile Island, 747 F.2d at 144 (quoting Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967)), cited with approval in Stewart, 908 F.2d at 1504. The district court correctly pointed out in its order denying summary judgment that
 
 
 28
 if defendants had stopped a suspect fleeing on foot by using a bow and arrow, or a knife, they would be charged with knowledge of Garner and earlier cases defining 'seizure,' and that they most certainly could not argue that it was not clearly established that the use of these weapons to stop a fleeing suspect constitutes a seizure. The result should be no different simply because defendant Soesbe allegedly used a patrol car as his deadly weapon.
 
 
 29
 Adams v. Lindsey, 759 F.Supp. 795, 799 (S.D.Fla.1991). The deputies were required to relate the established law of Garner to the analogous factual setting in this case. See People of Three Mile Island, 747 F.2d at 144, cited with approval in Stewart, 908 F.2d at 1504.
 
 
 30
 Justice O'Connor notes in her Garner dissent that "[b]y declining to limit its holding to the use of firearms, the court ... implies that the fourth amendment constrains the use of any practice that is potentially lethal, no matter how remote the risk." Garner, 471 U.S. at 31, 105 S.Ct. at 1711. Justice O'Connor's dissent points out that Garner recognizes that the use of deadly force against arrestees has limitations, regardless of the nature of the instrumentality used in applying the force. See Garner, 471 U.S. at 31, 105 S.Ct. at 1711; Mathis v. Parks, 741 F.Supp. 567, 572 (E.D.N.C.1990). This case is legally indistinguishable from Garner with the following two notable factual distinctions: (1) the instrumentality used in applying the force was an automobile instead of a gun, and (2) the officers were trying to apprehend a fleeing suspected misdemeanant instead of a fleeing suspected felon. Thus, the district court correctly held that "the concept of a seizure is clearly defined and sufficiently well developed such that it would be apparent to a reasonable official that a car moving at high speed can be the physical force used to apprehend a suspect just as can a gun." Adams, 759 F.Supp. at 800.
 
 
 31
 The district court also correctly noted that in Brower v. Inyo, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989),
 
 
 32
 the Court did not resolve any unsettled law in stating that the use of a car to sideswipe a suspect's car is a seizure. To the contrary, the Court relied on this hypothetical as an obvious example of a seizure in order to explain more thoroughly the basis for its holding.
 
 
 33
 Adams, 759 F.Supp. at 801.[3] Nevertheless, the deputies continue to argue that the law in this case was unsettled because until the Supreme Court decided Brower, the courts were in disagreement as to whether a seizure could result from a high-speed police chase which ends in a crash. The district court correctly pointed out that in each of the cases the deputies cited, "the plaintiff either lost control of or was a passenger in a vehicle that crashed without being hit by a patrol car, was a third party who was accidentally hit, or less often, had hit a roadblock." Adams, 759 F.Supp. at 801. None of the cases which the deputies cite involve the intentional use of a speeding patrol car to ram a plaintiff off the road. Thus, the cases the deputies cite at best support the proposition that the law was unsettled before Brower as to whether a seizure occurs when a fleeing suspect either loses control of a car or runs into a roadblock. We cannot ignore the crucial distinguishing fact of "intentional ramming" alleged in the amended complaint.
 
 
 34
 Before the incident in this case, the law was clearly established that the Fourth Amendment applies to all high-speed chases, regardless of the method of apprehension or termination of movement. See Colorado v. Bannister, 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43, n. 3, 66 L.Ed.2d 1 (1980). In Bannister, the Supreme Court noted that "[t]here can be no question that the stopping of a vehicle and the detention of its occupants constitute a "seizure" within the meaning of the fourth amendment." Bannister, 449 U.S. at 4 n. 3, 101 S.Ct. at 43 n. 3. Additionally, as early as 1976, a federal district court held that shooting out the tires of a suspect's car during a high-speed chase in order to bring it to a stop constituted a seizure. United States v. Matthews, 417 F.Supp. 813, 817 (E.D.Pa.), aff'd, 547 F.2d 1165 (3d Cir.1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1148, 51 L.Ed.2d 565 (1977). Thus, it has long been well established that the intentional successful use of physical force applied directly to an automobile in order to apprehend its occupants implicates the Fourth Amendment and constitutes a seizure.
 
 
 35
 Judge Edmondson points our attention to the case of Wright v. Whiddon, 951 F.2d 297 (11th Cir.1992). In Wright, a policeman shot and killed a pretrial detainee who attempted to escape from a courthouse. Although Garner had been decided six months earlier, this court held that the police officer was entitled to qualified immunity in the detainee's parents' section 1983 lawsuit alleging a violation of the Fourth Amendment. Judge Edmondson reasons that if the law was not clearly established that a police officer could not shoot a fleeing pretrial detainee in light of Garner, then this court cannot hold that the law was clearly established that a police officer could not intentionally ram the vehicle of a fleeing misdemeanant.
 
 
 36
 Our panel in Wright, however, distinguished that case from Garner (and the facts of this case) when it recognized that "Garner involved a person who had not yet been taken into official custody fleeing to avoid custody, while this case involved a person who had been captured, arrested, and detained awaiting trial, who then sought to escape custody." Wright, 951 F.2d at 300. Our panel also recognized that the Supreme Court has indicated that whether the fleeing individual is trying to avoid custody or escape custody may constitute a constitutionally significant distinction. See Wright, 951 F.2d at 300. The Supreme Court noted in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) that
 
 
 37
 [o]ur cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.
 
 
 38
 Graham, 109 S.Ct. at 1871 n. 10. Thus, the panel ruling in Wright that the police officer was entitled to qualified immunity was based primarily upon the possible inapplicability of the Fourth Amendment when the seizure or arrest ripens into detention. The area of law explored in Wright, as the Supreme Court indicated in Graham, is not settled.
 
 
 39
 Nevertheless, the law is clearly established in the area of suspects fleeing to avoid custody. See Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). This case involves persons in a fleeing car who had not yet been taken into official custody and whose driver was suspected of a misdemeanor. The facts of this case are more analogous to Garner than to Wright. Thus, the law in this case was clearly established, and the disposition of the case is consistent with established Eleventh Circuit precedent.
 
 
 40
 Although it was clearly established that the alleged events constituted a seizure, the deputies are still entitled to qualified immunity if it would not have been apparent to a reasonable official in their position that the seizure was "unreasonable" and thus violative of the Fourth Amendment. See Anderson, 483 U.S. at 640, 107 S.Ct. at 3039.
 
 
 41
 The Supreme Court held in Garner that "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out." Garner, 471 U.S. at 8, 105 S.Ct. at 1699; see also United States v. Ortiz, 422 U.S. 891, 895, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975); Terry v. Ohio, 392 U.S. 1, 28-29, 88 S.Ct. 1868, 1883-1884, 20 L.Ed.2d 889 (1968). Additionally, the Court held in Garner that the use of deadly force to apprehend a fleeing felon constitutes an unreasonable seizure unless the officer has probable cause to believe that the suspect poses a threat of serious bodily harm, either to the officer or to others. Garner, 471 U.S. at 11, 105 S.Ct. at 1701. Judge Edmondson turns our attention to the case of Smith v. Freland, 954 F.2d 343 (6th Cir.1992). In Smith, a police officer shot and killed a motorist who was trying to avoid custody and had fled from the police officer at speeds in excess of ninety miles an hour. Judge Edmondson again reasons that in a factual setting close to Garner, a federal court of appeals held that the police officer violated no Fourth Amendment right. Thus, Judge Edmondson would hold that the law is not clearly established that the officers in this case violated the Fourth Amendment rights of Adams.
 
 
 42
 The Sixth Circuit opinion in Smith, however, fully embraces this court's reasoning and extension of Garner. The facts of Smith, however, fitted squarely into the exception to the rule of Garner. The Supreme Court noted in Garner that "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Garner, 471 U.S. at 11, 105 S.Ct. at 1701. The Sixth Circuit found in Smith that the motorist posed a threat of serious physical harm to others since he had demonstrated that he would do almost anything to avoid capture. The motorist in Smith had assaulted the police officer by attempting to ram the police car in order to break through a road block, and the motorist was proceeding at extremely high speeds in a residential neighborhood.
 
 
 43
 In this case, the deputies do not contend that this case falls within the exception of Garner. In their pleadings and briefs they do not contend that the persons fleeing to escape custody in this case posed a serious threat of physical harm either to the officers or to others. The issue that was dispositive in Smith--the applicability of the Garner exception--has not been raised in this case and is not properly before this court.
 
 
 44
 In Garner, the Court also emphasized the common law rule that the use of deadly force to apprehend a misdemeanant is forbidden since such action was disproportionately severe. Garner, 471 U.S. at 15, 105 S.Ct. at 1703. The district court correctly noted that in this case,
 
 
 45
 plaintiff's complaint alleges that despite having stopped and released the driver on prior occasions, despite knowing his identity, his address, and his status as a fleeing nondangerous misdemeanant, despite knowing that he was only a fleeing nondangerous misdemeanant, and despite knowing that plaintiff's decedent had no outstanding warrants, defendant Soesbe deliberately used his car to ram them off the road in a residential neighborhood at high speed, thereby causing plaintiff decedent's death.
 
 
 46
 Adams, 759 F.Supp. at 803. When the principles of Garner are applied to these facts, this court concludes that it would have been apparent to a reasonable official in the deputies' position that their conduct violated Donald's clearly established Fourth Amendment right to be free from an unreasonable seizure.
 
 V. CONCLUSION
 
 47
 We hold that before the date of the incident in this case, the law was clearly established that a law enforcement officer's action of intentionally ramming an automobile during a high-speed chase, causing it to crash, and thereby terminating the freedom of movement of a passenger in the car constituted an unreasonable seizure which would have been apparent to a reasonable officer operating under similar circumstances. Accordingly, the deputies are not entitled to qualified immunity, and the district court's denial of summary judgment was proper.[4]
 
 
 48
 The district court's ruling is affirmed.
 
 
 49
 AFFIRMED.
 
 
 50
 HILL, Senior Circuit Judge, concurring specially:
 
 
 51
 I concur in the judgment of the court affirming the district court's denial of the defendants' motion for a summary judgment praying that, on any set of facts, the defendants would be protected by immunity.
 
 
 52
 I concur in our judgment because I conclude that one resolution of facts in dispute would present a case where constitutional "qualified immunity" would not be available to the officers. The plaintiff presents some evidence that the defendants sought to take the plaintiff's driver into custody by deliberately ramming the automobile. Such a seizure would violate a clearly established constitutional protection under the Fourth Amendment.
 
 
 53
 Under familiar tort law principles, an individual operating a vehicle in the way the defendants were alleged to be operating might be found liable. Racing an automobile with another might result in liability for injury to the occupants of the other vehicle should it crash. Crowding another vehicle on the highway or otherwise maneuvering in an effort to cause the other vehicle to come to a stop might well result in liability should the maneuvering be done carelessly and be the cause of a crash. Were the defendant not an officer of the law, many theories of liability might well sound. See, e.g., Orszulak v. Bujnevicie, 355 Mass. 157, 243 N.E.2d 897 (1969); Gomez v. Hensley, 145 Ariz. 176, 179, 700 P.2d 874, 877 (Ct.App.1984) ("persons who race automobiles on a highway are liable and negligent for injuries caused by one of them"); Finn v. Morgan, 362 N.Y.S.2d 292, 46 A.D.2d 229 (N.Y.App.Div.1974) (all parties to a drag race are responsible for the torts of the other parties). An officer is given qualified immunity against such tort theories unless his conduct gives rise to a constitutional violation.
 
 
 54
 A law enforcement officer may pursue one subject to arrest for a crime if he attempts to flee. Having successfully pursued and overtaken the fleeing suspect, the law enforcement officer is not constitutionally required to be a mere observer of the flight of his quarry. He can try to cause the pursued driver to bring the car to a stop and submit to custody. Galas v. McKee, 801 F.2d 200 (6th Cir.1986) ("By engaging in high speed pursuits, without more, police use absolutely no force," thus there is no seizure for purposes of the Fourth Amendment). This might be accomplished through maneuvers which would be highly dangerous at the high rates of speed to which the vehicles would be going. Just what bonafide efforts to stop the fleeing criminal might be undertaken are limited only by the imagination and the Fourth Amendment.
 
 
 55
 The police are not constitutionally responsible if they did not deliberately cause the chased car to crash. In Galas, the police had engaged in a high speed pursuit of a thirteen year old minor. The minor lost control of his car, crashed, and was severely injured. Id. at 202. The parents argued that the officers should have stopped the pursuit and allowed the minor to flee in order to lessen the chances of a serious accident. Id. While this argument might be relevant in a state tort action to show that the officer was negligent, so long as there has been no restraint by physical force, there has been no Fourth Amendment seizure. Id. at 203. See also Keller v. Truska, 694 F.Supp. 1384 (E.D.Mo.1988), and Roach v. City of Fredericktown, 693 F.Supp. 795 (E.D.Mo.1988) (related cases), aff'd, 882 F.2d 294 (8th Cir.1989) (chased suspect collides with another car, injuring his own passenger and the couple in the other car; the crash was not caused by the officer; therefore, there was no seizure). Moreover, high speed pursuits are not an unreasonable method of seizing suspected criminals. Galas, 801 F.2d at 203.
 
 
 56
 Unless the pursuing officer, despairing of apprehending the pursued safely, deliberately undertakes to bring him into custody by assaulting him with deadly force, I believe that the efforts would be constitutional. We are already instructed that the officer may not attempt to stop such a fleeing suspect with a firearm, unless the officer has probable cause to believe the suspect poses a threat of serious bodily harm, either to the officer or to others. Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). The use of an automobile to take a suspect into custody by inflicting the same or similar type of injury upon him that would be produced by a firearm violates the same constitutional principles.
 
 
 57
 This seizure with deadly force must be deliberate and willful. As the Supreme Court, in Brower v. County of Inyo, wrote,
 
 
 58
 A seizure occurs only when there is a governmental termination of freedom of movement through means intentionally applied.
 
 
 59
 489 U.S. 593, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (emphasis in original). If the suspect was stopped by his own act or negligence, or through the negligence of the officer's, there has been no seizure, and thus no constitutional violation. Id.
 
 
 60
 The result the officer would like to obtain by seizing the suspect with deadly force is not a factor to be considered. In Brower, although the officers may have wished that the fleeing suspect would have stopped on his own volition, the Supreme Court did not inquire into their subjective intent. Id. 109 S.Ct. at 1382. Under the plaintiff's allegations, the "seizure" occurred because the police put up a road block to stop him. Id. This seizure was "unreasonable" because the police set up the road block "in such a manner likely to kill him." Id.
 
 
 61
 If the plaintiff persuades the fact-finder that the defendant deliberately undertook to take his driver into custody through an assault by car, the officer would not be immune. If the events were otherwise as described by the officer, even though tort liability would otherwise exist, the officer would not be subject to respond in damages because in pursuing and apprehending a criminal, the officer would be immune.
 
 
 62
 The case is to be returned for trial. The trial judge must provide instructions, special verdict forms, or other devices to ensure that the officer shall not be exposed to damages if the jury does not find that a deliberate assault occurred.
 
 EDMONDSON, Circuit Judge, dissenting:
 
 63
 "The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.' Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law." Anderson v. Creighton, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (citations omitted). Because the court today has carved out an exception to the general rule of qualified immunity and would require police officers to foretell perfectly the evolution of Fourth Amendment law, even when that evolution has still not clearly established that the events in this case violated the Constitution, I dissent.
 
 
 64
 Plaintiff urges us to use Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), for the starting point in our analysis. But I think Garner's facts are too different from this case. To determine whether Fourth Amendment seizure was clearly established in this case, the more appropriate starting point is the courts' treatment of "deadman" roadblocks,[1] which are more analogous because they are used to stop fleeing vehicles and more pertinent because they present a stronger case for seizure than the facts here.
 
 
 65
 As recently as March 1989, a split existed among the federal circuit courts about whether the intentional use of a deadman roadblock created a Fourth Amendment seizure. Compare Brower v. Inyo County, 817 F.2d 540 (9th Cir.1987) (successful deadman roadblock resulting in fatalities constitutes no seizure), rev'd, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) with Jamieson v. Shaw, 772 F.2d 1205 (5th Cir.1985) (successful deadman roadblock constitutes seizure). Today, however, this court holds that in May 1985 the law was clearly established to the extent that a reasonable police officer would have known that ramming[2] a fleeing car during a high-speed pursuit constituted a seizure, and more than that, an unreasonable seizure, under the Fourth Amendment. I disagree.
 
 
 66
 To overcome defendant-appellants' qualified immunity, plaintiff bears the burden of showing, see Davis v. Scherer, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984), that in May 1985 it was clearly established that defendants violated the Fourth Amendment. Plaintiff has failed to carry this burden.
 
 
 67
 Plaintiff first advances Tennessee v. Garner to support the proposition that defendants in this case should have known they were "seizing" Adams by ramming the car in which he was a passenger.[3] But given Garner 's facts, Garner stands chiefly for the proposition that "a police officer's fatal shooting of a fleeing suspect constituted a Fourth Amendment 'seizure.' " Brower, 489 U.S. at 595, 109 S.Ct. at 1380 (citing Garner, 471 U.S. at 7, 105 S.Ct. at 1699; id. at 25, 105 S.Ct. at 1708 (O'Connor, J., dissenting)). Plaintiff "cannot discharge h[is] burden by making general conclusory allegations of some constitutional violation or by stating broad legal truisms. Rather, as the courts have plainly stated, plaintiffs must prove the existence of a clear, factually defined, well-recognized right of which a reasonable police officer should have known.... The right must be particularized to put potential defendants on notice that their conduct probably is unlawful." Barts v. Joyner, 865 F.2d 1187, 1190 (11th Cir.1989) (citations omitted) (emphasis added).
 
 
 68
 When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. See, e.g., Edwards v. Gilbert, 867 F.2d 1271, 1277 (11th Cir.1989). Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.
 
 
 69
 Plaintiff has produced only two cases, one from Pennsylvania's Eastern District and one from New York's Southern District--and both affirmed without opinion on different points of law--to support his contention that in 1985 it was clearly established that using physical force to stop a fleeing vehicle constituted a seizure. See Taylor v. Mayone, 599 F.Supp. 148 (S.D.N.Y.1984), aff'd without opinion, 779 F.2d 39 (2d Cir.1985); United States v. Matthews, 417 F.Supp. 813 (E.D.Pa.1976), aff'd without opinion, 547 F.2d 1165 (3rd Cir.1976). But these cases carry no or almost no weight in demonstrating clearly established law because district courts cannot "clearly establish" law. See Muhammad v. Wainwright, 839 F.2d 1422, 1425 (11th Cir.1987) ("[A] district court opinion, particularly from outside the circuit, cannot, in and of itself, settle the law."). Note, too, that the cases were affirmed without opinion on issues of law not on point here: seizure was presumably conceded in Taylor, while the court's discussion of seizure (shooting out the tires of a suspected felon) in Matthews was dictum. These cases establish no law clearly and fail to overcome defendants' qualified immunity.
 
 
 70
 As I stated earlier, see supra, until the Supreme Court's decision in Brower, the intentional, successful use of physical force--a deadman roadblock--applied directly to an automobile was considered by the Ninth Circuit to constitute no seizure. See Brower, 817 F.2d at 546-47. Also, not until October 1985--after the incident here--did the Fifth Circuit in Jamieson first determine that the intentional, successful use of a deadman roadblock constituted a seizure.[4] So, while the Supreme Court stated in dicta in 1989 that "sideswiping" a car to produce a crash would constitute a seizure, Brower, 489 U.S. at 597, 109 S.Ct. at 1381, as of 1985 no court had ever held that ramming or sideswiping a car effected a Fourth Amendment seizure.[5] In addition, since 1985 other appellate judicial opinions have determined that conduct similar to that of defendants here was no seizure in the Fourth Amendment sense. See, e.g., Brower v. Inyo County, 817 F.2d 540 (9th Cir.1987), rev'd, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Because plaintiff has failed to produce clearly established law showing that the police in 1985 would reasonably know they were "seizing" decedent by ramming the fleeing car, defendants are entitled to summary judgment on qualified immunity grounds.
 
 
 71
 Although defendants bear no burden of showing the law was unsettled, they call our attention to Clark v. Nassau County, No. 89-1000-Civ-J-14, 1991 WL 350041 (M.D.Fla. filed Sept. 11, 1991), appeal docketed, No. 91-3984 (11th Cir. Oct. 21, 1991). In Clark, a district court in Florida recently held that a passenger of a fleeing car, which had been brought to a halt by multiple gunshots and collisions, had not been "seized" until, after the car was no longer able to move, a policeman approached the immobile car and accidentally fired a bullet through the passenger's head. Id. slip op. at 16. While Clark has not yet passed appellate review, it is a reasoned opinion and nothing indicates the opinion is the result of gross incompetence or neglect of duty; as such (even if ultimately found to be incorrect), Clark stands for the proposition that, even now, the law is not clearly established about what constitutes a Fourth Amendment seizure when fleeing cars are chased. Again, if a reasonable judge in 1991 does not consider the facts in Clark to constitute a seizure, how can we say that in 1985 all reasonable police must have believed that ramming a fleeing car constituted a Fourth Amendment seizure? See supra note 4 (citing Barts v. Joyner, 865 F.2d at 1193).
 
 
 72
 Even if I assumed that the law in 1985 clearly established that striking a car constituted a seizure, I would still conclude that defendants were due qualified immunity because plaintiff has produced no case law to support the idea that the method of seizure was unreasonable within the context of the Fourth Amendment and the facts of this case. Plaintiff
 
 
 73
 cannot point to sweeping propositions of law and simply posit that those propositions are applicable. Instead, the [plaintiff] must draw the court's attention toward a more particularized and fact-specific inquiry [showing] that there existed sufficient case law establishing the contours of his or her constitutional rights such that the unlawfulness of the defendant's conduct would have been apparent to a reasonable official in the same circumstances.... If no such case law exists, then the defendant is entitled to qualified immunity.
 
 
 74
 Nicholson v. Georgia Dept. of Human Resources, 918 F.2d 145, 147 (11th Cir.1990). Plaintiff has produced nothing clearly establishing the unreasonableness of the alleged "seizure" by automobile, so defendants are entitled to qualified immunity.
 
 
 75
 Plaintiff rests on the broad assertion from Garner that "the common law ... forbids the use of deadly force to apprehend a misdemeanant, condemning such action as disproportionately severe." 471 U.S. at 15, 105 S.Ct. at 1703. I agree with this as a general proposition of law. But general propositions have little to do with qualified immunity decisions: "generalities are just not helpful." Muhammad, 839 F.2d at 1424. I disagree that in 1985 (or now) it was (or is) clearly established that, under the circumstances here, defendants were exerting deadly force or unreasonably seizing the car's passengers. In 1985, Garner 's reach and limits had not been defined in this circuit, particularly in the high-speed automobile chase context. "The bright line of 'clearly established law' remained to be staked out by a process of inclusion and exclusion in individual[, concrete] cases." Barts, 865 F.2d at 1194.
 
 
 76
 Even in Brower, the Supreme Court declined to hold that the use of a deadman roadblock there was necessarily unreasonable:
 
 
 77
 [I]f Brower had the opportunity to stop voluntarily at the roadblock, but had negligently or intentionally driven into it, then, because of lack of proximate causality, respondents, though responsible for depriving him of his freedom of movement, would not be liable for his death.... Thus, the circumstances of this roadblock ... may yet determine the outcome of this case.
 
 
 78
 489 U.S. at 599, 109 S.Ct. at 1382-83 (emphasis added). Recall, too, that in Garner the Court was split 6-3 over the question whether shooting an unarmed, fleeing felony suspect was unreasonable, 471 U.S. at 22, 105 S.Ct. at 1707 (O'Connor, J., dissenting, joined by Burger, C.J. and Rehnquist, J.); put differently, at about the time of the car chase underlying this case, it was unclear to some learned jurists that shooting a fleeing, unarmed, suspected nighttime burglar in the back of the head was unconstitutional. That there were dissenters does not affect the force of the Garner decision as law. But the existence of dissenters is pertinent to how unsettled the law was around the time Garner was decided and to how Garner might or might not be extended to other facts in the future.
 
 
 79
 Further supporting the unsettled nature of the law on seizures immediately following Garner is our recent decision in Wright v. Whiddon, 951 F.2d 297 (11th Cir.1992). In Wright, defendant policeman shot and killed a pretrial detainee who tried to escape from the courthouse. Although the detainee had confessed to armed robbery, he had offered no resistance to three previous arrests, threatened nobody during his escape attempt and, more important, at the time he was killed he was known to be unarmed. Id. at 298. These facts were close to those in Garner, yet this court reversed the district court's denial of summary judgment and remanded the case with instructions to grant summary judgment in favor of the policeman. Id. at 301. The court decided the policeman was entitled to qualified immunity because no clearly established law existed even six months after Garner that would have forced a reasonable police officer to see that the Supreme Court's Fourth Amendment analysis in Garner would be extended to protect a pretrial detainee. Id. at 300.[6]
 
 
 80
 Plaintiff in this case, however, asks us to hold that six weeks after Garner, a reasonable police officer--despite that Garner had nothing to do with one car striking another or even with car chases in general--would necessarily have known that, in the context of the car chase in this case, he was violating the Fourth Amendment by an unreasonable seizure. A police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person. A gun is an instrument designed for the destruction of life or the infliction of injury, and death or injury will result if a person is struck by a bullet. While an automobile is capable of lethality, it is not designed to kill or to injure; and even when automobiles strike each other, death and injury may well not result (for instance, plaintiff claims that Adams' car was struck several times but only one blow allegedly resulted in a crash). Even if a policeman knew that he could not use "deadly force" to stop a misdemeanant who was fleeing in a car, I cannot say that, considering the 1985 case law, a reasonable policeman would necessarily know that hitting the fleeing car was just like shooting a person: a use of deadly force per se--that is, force almost certain to cause death or great bodily harm (not just capable of it).
 
 
 81
 As of May 1985 no reported decision held that physically forcing a car off the road, without more, constituted an unreasonable seizure. And as recently as January 1992 the Sixth Circuit in Smith v. Freland, 954 F.2d 343 (6th Cir.1992), cert. denied, --- U.S. ----, 112 S.Ct. 1954, 118 L.Ed.2d 557 (U.S. Mar. 30, 1992) (No. 91-1602), affirmed a district court decision that a police officer in 1988 violated no Fourth Amendment right by shooting and killing a misdemeanant driver escaping at high speeds. In Smith, the decedent driver initiated a high-speed chase to elude arrest after speeding and running a stop sign. Id. at 344. There were allegations that the decedent driver had endangered the life of the fleeing policeman, but this charge was disputed, id. at 346; and the court's decision turned solely on whether the fleeing driver posed danger to others. Id. at 348. The court held that, because of these dangers, shooting and killing the fleeing driver violated no Fourth Amendment right.
 
 
 82
 To resolve the question of qualified immunity, we need not decide today whether the Fourth Amendment was violated. But it is doubtful that the alleged level of force in this case was unconstitutionally excessive. A driver--even a misdemeanant--eluding arrest in a car driven at high speeds creates a dangerous and potentially deadly force. See id.; cf. Cooper v. State, 573 So.2d 74, 76 (Fla.Dist.Ct.App.1990); United States v. Garcia, 868 F.2d 114, 116 (4th Cir.1989). Plaintiffs have brought no case law to our attention, and my research has uncovered no case law, stating or even hinting that ramming a speeding car that presents danger to the public would be an unreasonable seizure under the Fourth Amendment. Even the Court in Garner recognized that, when a fleeing suspect poses a threat of danger to others, a higher degree of force is permissible. 471 U.S. at 11, 105 S.Ct. at 1701. Under the circumstances alleged here, the police very possibly behaved lawfully.
 
 
 83
 Today's court seeks to avoid this Garner exception by stating that defendants failed to invoke expressly the exception and that defendants failed to contend that the fleeing car posed a serious threat of physical harm. While I recognize that defendants here have not specifically and expressly invoked the Garner-exception argument, I do not know that they, as a matter of law, must do so; we know that Adams' car fled at high speeds through residential neighborhoods, see Plaintiff's Amended Complaint at 4, par. 17; Brief for Appellee at 3; Brief for Appellant at 4, and defendants have told the courts that the fleeing car allegedly tried to run a deputy's vehicle off the road. See, e.g., Brief for Appellant at 4. Even if we ignore the allegation about the assault on the deputy, the speeding-car chase is undisputed; and the danger to others posed by the speeding car is self-evident. In the light of this self-evident danger and Freland's holding that, under virtually identical circumstances, a "reasonable" police officer could shoot and kill a fleeing misdemeanant, I think it is wrong to say that in 1985 defendants--or more correctly, reasonable police officers in defendants' situation--must have known their conduct was unlawful.
 
 
 84
 "The line between the lawful and the unlawful is often vague. [The] 'clearly established' standard demands that a bright line be crossed. That line is not to be found in abstractions--to act reasonably, to act with probable cause, and so forth--but in studying how these abstractions have been applied in concrete circumstances. In 198 the relevant case law was still developing [and] the key issue in this case had not been clearly settled." Barts, 865 F.2d at 1194.
 
 
 85
 So, whatever I personally might think about a police car ramming a fleeing car under the circumstances plaintiff has alleged, I cannot say that under these same circumstances a reasonable police officer in 1985 would necessarily have known his actions to be violative of the Constitution. And, "[u]nless it can be said that the state of law was of such clarity that a reasonable official should have been on notice that his or her challenged conduct was unlawful, that official is entitled to immunity." Nicholson, 918 F.2d at 147. Here, plaintiff has failed to show the existence in 1985 of case law that would have made it readily apparent to the police that their conduct was unlawful. Defendants, therefore, are entitled to qualified immunity and should have been granted summary judgment.
 
 
 86
 I would also qualify the court's statement that, if we affirm the denial of summary judgment, defendants "are not entitled to qualified immunity".[7] See supra at 1567. Today's court has authority to decide only that, taking as true all of the allegations in plaintiff's pleadings, defendants are unentitled to qualified immunity at this stage of the proceedings. As the court correctly notes, see id. opinion at 1567 n. 2, by losing at the summary judgment phase, defendants lose only their entitlement not to stand trial. After a trial, the jury may find that the defendants have no liability, finding defendants did nothing unlawful. Even if the jury decides that defendants did act unlawfully, defendants keep their right to be immune from liability if, when all the evidence is presented, their conduct--as found by the ultimate fact finder after hearing conflicting versions of what happened--violated no legal right that was clearly established in 1985.[8] See generally Hamm v. Powell, 874 F.2d 766, 770-71 (11th Cir.1989), aff'd on reh'g, 893 F.2d 293 (11th Cir.1990). Therefore, at the new trial, one issue the trial judge must resolve either after plaintiff's case-in-chief or after the close of all the evidence or after the verdict or after all three is whether defendants' acts violated law that was already clearly established when the acts took place.
 
 
 87
 I would reverse the denial of summary judgment.
 
 
 
 [1]
 For purposes of qualified immunity, the police officers may take the position that the plaintiff's allegations are true. If the officers create a "genuine issue of material fact" when seeking qualified immunity, the district court may deny their motion for summary judgment. See Hudgins v. City of Ashburn, Ga., 890 F.2d 396, 403 (11th Cir.1989). The officers may admit to an intentional ramming for qualified immunity purposes (to forego a trial), but may deny an intentional ramming at trial (to avoid liability). Therefore, a ruling denying the officers' motions for summary judgment does not render the officers liable. The district court correctly noted that:
 The Court may resolve Defendants' motion notwithstanding the existence of factual disputes relevant to the determination of whether a reasonable official could have believed Defendants' actions to be lawful in light of the information then known to Defendants. Factual disputes do not preclude the Court from granting summary judgment if the plaintiff's complaint does not allege a violation of clearly established law because, if the complaint does not meet this threshold requirement, any factual disputes existing at the summary judgment stage are not 'material.' See Bennett v. Parker, 898 F.2d 1530, 1536 n. 2 (11th Cir.1990) (Tjoflat, C.J., concurring) ('The court considers in the light most favorable to the plaintiff all facts fairly inferable from the record--regardless of factual disputes--and decides whether, under those facts, defendant's conduct violated law clearly established at the time'); McDaniel v. Woodard, 886 F.2d 311, 313 (11th Cir.1989) ('That factual disputes remain does not preclude summary judgment based on qualified immunity.').
 Adams v. Lindsey, 759 F.Supp. 795, 797 n. 4 (S.D.Fla.1991).
 
 
 [2]
 Qualified immunity is a legal question which the district court can decide either before the trial on a summary judgment motion, during the trial on a directed verdict motion, or after the trial on a motion for judgment notwithstanding the verdict. It is axiomatic that while the district court's term is in existence, the district court has "plenary power ... to modify [its] judgment for error of fact or law or even revoke it altogether." Zimmern v. United States, 298 U.S. 167, 169-170, 56 S.Ct. 706, 706-707, 80 L.Ed. 1118 (1936). Qualified immunity, however, cannot be argued to the jury as a defense to liability. See Ansley v. Heinrich, 925 F.2d 1339 (11th Cir.1991). Qualified immunity is more related to whether a state public official must stand trial than whether the public official may successfully defend against the plaintiff's claims
 
 
 [3]
 In Brower, the driver of a stolen car was killed during a high-speed chase when he crashed into a concealed police roadblock. The Supreme Court held that the alleged facts constituted a seizure because the driver was stopped through intentionally applied governmental means. As an obvious example of a seizure in order to explain the basis for its holding, the Supreme Court offered the following hypothetical: "If, ... the police cruiser had pulled along side the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure." Brower, 489 U.S. at 597, 109 S.Ct. at 1381
 
 
 [4]
 The deputies also raise the issue of whether the court should exercise pendent appellate jurisdiction and review the trial court's ruling granting a new trial. In this case, the district court refused to give any instructions defining excessive force or deadly force. Additionally, the district court refused to give any instruction regarding the circumstances under which deadly force was reasonable or justified. In light of the foregoing analysis of the district court's denial of summary judgment, the instructions taken as a whole clearly did not adequately cover the issues which the plaintiff raised and thereby prejudiced him. Thus, the district court did not abuse its discretion in granting the motion for new trial. See Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)
 
 
 [1]
 A deadman or "blind" roadblock is an obstacle (usually a police car or truck) placed across the road in a manner that prevents an oncoming driver who is being pursued by the police from knowing the road is blocked; and it is an obstacle that is almost certain to stop violently, and more likely than not fatally, the oncoming driver in a direct collision. The certainty of collision arises from the fact that pursuing police officers momentarily blind the driver by flashing a bright spotlight or their headlights in the oncoming driver's eyes
 
 
 [2]
 As did the court today, I assume the fact of ramming from plaintiff's pleadings
 
 
 [3]
 Whether the passenger Adams was seized in a Fourth Amendment sense is also unclear because he may not have been the object of the pursuit. Although police were chasing the driver of the car, a seizure of the car--with Adams in the back seat--might have been a seizure of Adams if Adams were the true object of the seizure. Brower, 489 U.S. at 596, 109 S.Ct. at 1381 ("A seizure occurs even when an unintended person ... is the object of the ... taking."). A very real possibility exists, however, that because Adams--the passenger--was not the "object" of the seizure, Adams was not "seized." See, e.g., Landol-Rivera v. Cosme, 906 F.2d 791, 795-96 (1st Cir.1990) (holding that, when innocent hostage in fleeing car is shot by police who are pursuing driver, no Fourth Amendment seizure occurs)
 
 
 [4]
 Jamieson, which was decided seven months after Garner and five months after the incident here, was a reversal of a lower court decision from the Northern District of Mississippi dismissing plaintiff's Fourth Amendment claim. 772 F.2d at 1207. The plaintiff in Jamieson was a minor passenger in a car operated by a driver who did nothing more than speed away from police officers: he was suspected of no crime; until speeding away, he was driving in conformity with all applicable laws; and no warrant existed for his arrest. It worries me that today's court seems to hold that the police officers in this case ought to have known that their acts violated the Constitution when a United States District Judge--confronted with harsher facts--did not see a violation. And while the district court decision in Jamieson is unreported, nothing in the Fifth Circuit's discussion says the district court's decision resulted from gross incompetence or neglect of duty. I continue to believe that "[w]e cannot realistically expect that reasonable police officers know more than reasonable judges about the law." See Barts v. Joyner, 865 F.2d 1187, 1193 (11th Cir.1989)
 
 
 [5]
 Even if the Court's statement about automobiles' striking in Brower were not dicta, it would have been the first time the Court so held and would have established nothing in 1985. The Supreme Court has rejected such "hindsight-based reasoning in immunity issues." Mitchell v. Forsyth, 472 U.S. 511, 535, 105 S.Ct. 2806, 2820, 86 L.Ed.2d 411 (1985)
 
 
 [6]
 I agree that Wright can be distinguished from this case factually. But so can Garner. The point is that cases deciding questions similar to this one--that is, deadly force/seizure issues--are not uniform and show that Garner did not settle much except what Garner, itself, plainly decided given Garner's facts
 
 
 [7]
 Because I would reverse the denial of summary judgment and dismiss the case on qualified-immunity grounds, I would not have exercised this court's pendent appellate jurisdiction to reach the question whether a new trial should have been granted
 
 
 [8]
 While the legal question of qualified immunity does not go to the jury, e.g., Ansley v. Heinrich, 925 F.2d 1339 (11th Cir.1991), today's court correctly notes, see supra at 1578 n. 7, that the trial judge retains the power to determine the question in defendants' favor. I would add that, apart from finding qualified immunity on a directed verdict or a JNOV, the judge can and, when needed, should use special verdicts or written interrogatories to the jury to resolve disputed facts before the judge rules on the qualified-immunity question. See Fed.R.Civ.P. 49